2012 OK 66

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**John Brandon HILL, Respondent.**

**SCBD No. 5693.**

Supreme Court of Oklahoma.

June 26, 2012.

Ted D. Rossier, Assistant General Counsel, Katherine M. Ogden, Staff Attorney, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Tom M. Cummings, Oklahoma City, Oklahoma, for Respondent.

COLBERT, V.C.J.

¶ 1. Complainant, Oklahoma Bar Association (OBA), filed a fourteen-count complaint against Respondent, John B. Hill, pursuant to Rule 6, of the Rules Governing Disciplinary Proceedings, (RGDP), Okla. Stat. tit. 5, ch. 1, app. 1–A (2011), for violating the Oklahoma Rules of Professional Conduct, (ORPC), Okla. Stat. tit. 5, ch. 1, app. 3–A (2011).[1] The OBA and Respondent then entered into a stipulation of facts and mitigating factors. A panel of the Professional Responsibility Tribunal (PRT) considered the complaint, evidence presented, and parties' stipulations. The PRT found that the OBA failed to establish certain rule violations and unanimously recommended, over the OBA's objection, the imposition of a public censure and assessed the costs of these proceedings to Respondent. Additional requirements were also recommended. After reviewing the matter de novo, this Court adopts the

---

1. Unless the application of a rule to the conduct at issue in this disciplinary matter would be changed by a subsequent amendment, this opinion will cite to and quote from the most recent version of the Oklahoma Rules of Professional Conduct (ORPC), Okla. Stat. tit. 5, ch. 1, app. 3–A (2011), and the Oklahoma Rules Governing Disciplinary Proceedings (RGDP), Okla. Stat. tit. 5, ch. 1, app. 1–A (2011).

PRT's recommendation of a public censure along with the assessment of costs.

¶ 2. The record before this Court includes the: (1) depositions of Respondent and his spouse; (2) OBA's complaint and reply briefs; (3) Respondent's answer brief; (4) OBA's application to assess costs and Respondent's objection thereto; (5) hearing transcript, along with the parties' stipulations and other evidence attached; and (6) PRT's report.

## SCOPE AND STANDARD OF REVIEW

¶ 3. "In bar disciplinary proceedings, this Court exercises exclusive original jurisdiction as a licensing court, not as a reviewing tribunal." RGDP 1.1; *State ex rel. Okla. Bar Ass'n v. Berger,* 2008 OK 91, ¶ 12, 202 P.3d 822, 825. It is the responsibility of this Court to examine the record and assess the credibility and weight of the evidence in order to determine whether it clearly and convincingly establishes professional misconduct by a respondent and, if so, what the appropriate discipline, if any, should be. *State ex rel. Okla. Bar Ass'n v. Stutsman,* 1999 OK 62, ¶ 4, 990 P.2d 854, 858. Our review is de novo and we are not bound by the panel's advisory recommendations. *State ex rel. Okla. Bar Ass'n v. Todd,* 1992 OK 81, ¶ 2, 833 P.2d 260, 262; *State ex rel. Okla. Bar Ass'n v. Wilburn,* 2006 OK 50, ¶ 4, 142 P.3d 420, 422. While engaging a full-scale non-deferential de novo review, this Court may approve the PRT's findings of fact, "make its own independent findings ... or take such other action as it deems appropriate." RGDP Rule 6.15(a).

## PROCEDURAL BACKGROUND AND MISCONDUCT

¶ 4. Respondent graduated from the Oklahoma City University, School of Law in 2002. He was admitted to the Oklahoma Bar Association and his name was entered on the Roll of Attorneys in 2004, upon his successful completion of the Oklahoma Bar Examination. At all times relevant to this complaint, Respondent has been duly licensed to practice law in this State, and has never been disciplined by this Court.

¶ 5. Upon admission to the OBA, Respondent worked for a medical malpractice defense firm for two years. In 2006, Respondent and his family moved to Hugo, Oklahoma, his hometown, and established a solo practice. While there, Respondent established the firms's operating and IOLTA Trust Accounts at First United Bank. Respondent's wife, Jamie Hill, had signatory authority on the business' operating account.

¶ 6. Respondent employed Wife, as the office manager. Wife assisted with client intake and managed all of the firm's banking matters-including, reconciling Respondent's operating and trust accounts. Respondent also employed a number of secretarial staff at different times.

¶ 7. In 2007, Respondent and his wife began experiencing marital problems. In addition, the couple struggled with the recent loss of a child. In December 2007, Respondent filed for divorce and removed Wife's name from the business' operating account. Wife and the parties' children moved out of the marital home. The Hills' later reconciled and dismissed the divorce action in January, 2008. Shortly thereafter, Wife instituted a subsequent divorce proceeding and left with the couple's children.

¶ 8. During this turbulent time in the couple's marriage, Respondent began suffering from depression. In August 2008, Respondent checked himself into Valley Hope, an inpatient treatment center in Cushing, Oklahoma. However, he was subsequently released because the inpatient program was restricted to treating individuals with substance abuse problems. So, in September 2008, Respondent relocated to Oklahoma City and entered the Lawyers Helping Lawyers program. Yet, Respondent's practice remained open. All the while, Wife continued to manage Respondent's practice and oversee the firm's operating and trust accounts. In so doing, Wife, along with various secretarial staff, began writing checks on the firm's operating and trust accounts without Respondent's knowledge or consent. It is against this canvas of unfortunate events that the following grievances were lodged.

### Tom Hadley Grievance

¶ 9. Teresa Wickson retained Respondent to handle three matters: (1) a personal injury claim; (2) a probate case; and (3) a guardianship proceeding. Both Respondent and Wickson agreed that Respondent was hired on a 45% contingency fee basis for the personal injury case. However, neither party could produce the signed agreement. In February 2008, Respondent settled Ms. Wickson's personal injury case for $20,000. Respondent received two checks from the insurance company, one for $11,000 and the other for $9,000. Respondent and Ms Wickson acknowledged that the $9,000 check represented Respondent's 45% attorney fee and that the remaining check was for the benefit of Ms. Wickson and certain medical lien holders.

¶ 10. Rather than disburse Ms. Wickson's $11,000 settlement check into the trust account, Wife deposited both checks into Respondent's operating account which resulted in the commingling of the client's trust funds with Respondent's personal funds. Over the next several months, communication between Respondent and Ms. Wickson ceased; Respondent failed to provide an accurate accounting of the settlement funds and failed to appear at an emergency hearing in the guardianship proceeding.[2]

¶ 11. Ms. Wickson subsequently retained Tom Hadley to inquire into the status of her personal injury case and resolve the guardianship matter. Mr. Hadley sent several letters to Respondent requesting information regarding Ms. Wickson's personal injury case, to no avail. Mr. Hadley later contacted the insurance company and was advised that Respondent previously settled the claim. Mr. Hadley then contacted Respondent and demanded the settlement funds be delivered to his office.

¶ 12. Tom Hadley, later filed a grievance with the OBA concerning Respondent's representation of Ms. Wickson. Respondent admitted to receiving one of the two checks but denied cashing either one. According to Respondent, he endorsed the $9,000 check representing his portion of the settlement funds, but his staff endorsed the other check and deposited both in his operating account. And, because Respondent was not monitoring his accounts, the monies were commingled with his personal finances and was spent.

¶ 13. On October 5, 2009, Respondent delivered the entire $20,000 to Mr. Hadley and personally paid the medical liens in Ms. Wickson's case. As a result, Respondent did not retain any of his earned fees.

### Fred Moores Grievance

¶ 14. Fred Moores retained Respondent to represent him in a criminal matter scheduled for trial on July 28, 2008. On the way to the trial, from a camping trip with his sons, the radiator exploded and the clutch burned out in Respondent's car. As a result, Respondent failed to appear. The trial judge removed Respondent from the case and assessed the jury fee as a sanction against Respondent.

¶ 15. Respondent subsequently provided the presiding judge with documentation supporting the condition of his vehicle. However, as of the date of the grievance, Respondent has not paid the jury fee upon the advice of his counsel.

### Mary Holaday Grievance

¶ 16. In March 2008, Mary Holaday retained Respondent to complete two step-parent adoptions. Respondent charged Ms. Holaday a flat fee of $2,500 for the adoption cases. Ms. Holaday advanced Respondent $1,000 of the retainer fee. Respondent prepared the adoption pleadings, reviewed them with Ms. Holaday, but failed to file the pleadings with the court. Upon discovering the oversight, Ms. Holaday fired Respondent and retained alternate counsel at an additional expense. Respondent offered to complete the adoption for the $1,000 previously paid. Ms. Holaday, however, declined. A year later, Respondent refunded the entire $1,000 retainer. Although a grievance was filed and

---

**2.** The record reveals that the hearing notice was mailed to Respondent but at an incorrect address. Although Ms. Wickson received notice of the hearing, she cannot recall whether she attempted to advise Respondent of that hearing.

the OBA inquired into the matter, Respondent never responded.

### Tracy Fields Grievance

¶ 17. In July 2008, Tracy Fields hired Respondent to represent him in a criminal matter. Mr. Fields paid Respondent a $3,000 retainer. Mr. Fields stated that he expected Respondent to prevent the District Attorney from filing charges. However, when the District Attorney filed charges, Mr. Fields immediately filed a bar complaint against Respondent and retained subsequent counsel. The OBA inquired into the matter. However, Respondent failed to timely respond. Additionally, there is conflicting evidence regarding communication between Respondent and Mr. Fields. Respondent ultimately refunded Mr. Fields' $3,000 retainer in November 2009.

¶ 18. The OBA filed a formal complaint on November 2, 2010, but it was later amended on January 31, 2011. Respondent answered on November 2, 2010, and again on February 23, 2011.

¶ 19. The seconded amended complaint alleged that Respondent's conduct violated certain mandatory provisions of the ORPC and the RGDP.[3] In addition to the grievances lodged, the OBA alleged that Respondent

commingled and converted client trust funds; was derelict in the handling of his office affairs, financial accounting and failed to supervise subordinate non-lawyers—all of which warranted the imposition of professional discipline.

### Proceedings Before the PRT

¶ 20. The matter was tried to the PRT on March 9, 2011.[4] Testimony was taken from various witnesses including Wife; Respondent, Rex McLauchlin, Respondent's Licensed Professional Counselor; and Sharon Orth, the OBA investigator.

¶ 21. At the hearing, Wife testified that during the time she and Respondent were in the midst of a divorce, she was angry and wanted to "destroy him."[5] Wife admitted that she and various secretarial staff created a rubber stamp with Respondent's signature and then used the stamp to cash checks without Respondent's knowledge or consent. Wife testified that she used Respondent's operating and trust accounts for her personal benefit and she resisted any attempts Respondent made to regain control over his financial affairs.[6] She also testified that she inadvertently deposited the $11,000 Wickson check, and other checks, into Respondent's operating account.

```
A:  Yes.
* * * *
Q:  Did you ever make an allegation that your
    husband used methamphetamine?
A:  Yes, I did.
Q:  Has your husband ever used methamphet-
    amine?
A:  Not to my knowledge.
```

---

**3.** The OBA's allegations encompass violations of the mandatory provisions of the ORPC, specifically Rules 1.1 (Competent Representation, legal knowledge, skill, thoroughness, and reasonable preparation), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.15 (Safekeeping Property), 1.16 (Declining or Terminating Representation), 5.3 (Responsibilities Regarding Non-lawyer Assistants), 8.1 (Failure to Respond to OBA Inquires), 8.4 (Misconduct); and the RGDP, specifically 1.3 (Actions Contrary to Prescribed Standards of Conduct), and 5.2 (Failure to Fully Cooperate in the Grievance Process).

**4.** At the outset of the hearing, the OBA dismissed one of the fourteen counts previously filed against Respondent.

**5.** Q: And I know that that's hard for you to talk about now and you all love one another and I know he loves you very much and you have a strong marriage and you all are together, but that period of time, you wanted to destroy him, didn't you?
A: Yes.
Q: And you did whatever you could to do that, didn't you?

**6.** It should be noted that during Wife's deposition, Wife testified that when Respondent discovered the financial havoc Wife caused, Respondent changed his bank account numbers, confronted the bank about their complacency in permitting unauthorized signers to access his accounts, and that Respondent changed the locks to his office several times in an effort to keep Wife out. Wife, however, would secretly obtain a copy of the office key and:

A: I'm not proud of this, but if I got desperate for money, I would—I wouldn't think—if I have to leave, I will go and get a check.
Q: Off of one of his business accounts—
A: Yes.
Q:—and use it. . . .
A: Yes.

¶ 22. Respondent testified that the decision to abruptly move to Oklahoma City was made while he was suffering from a serious and deep depression. Respondent stated that he needed and sought immediate treatment from the Lawyers Helping Lawyers program. The Lawyers Helping Lawyers program referred Respondent to a licensed practicing counselor who placed Respondent under the care of a psychiatrist. Pursuant to his counselor's orders, Respondent was directed not to return to Hugo.

¶ 23. As it relates to Respondent's banking matters-Respondent testified that upon discovering Wife's mishandling of his business accounts, Respondent admonished the bank countless times about permitting unauthorized signers to access his accounts. And, on one occasion, a bank employee was terminated as a result of the bank's questionable practices.

¶ 24. Respondent's Counselor, Rex McLauchlin, testified that he provided weekly therapy to Respondent for the past two years. He testified that at Respondent's initial visit, Respondent suffered from bipolar disorder, hypomania, severe depression, difficulty controlling his emotions, tearfulness, difficulty making decisions and extreme fear; and Respondent likely had been experiencing these symptoms for several years. Mr. McLauchlin referred Respondent to a board certified psychiatrist. The psychiatrist confirmed Respondent was suffering from bipolar disorder and prescribed the appropriate medication. Mr. McLauchlin believed that in the period preceding Respondent's treatment, Respondent's condition impacted his thought process and ability to think through difficult situations. Based on Respondent's medical condition, Mr. McLauchlin opined that Respondent was incapable of practicing law and unable to properly respond to the OBA's complaints.

¶ 25. Additionally, Mr. McLauchlin testified that he notified the General Counsel's investigator of Respondent's bipolar disorder on October 8, 2008 by letter and telephone.[7]

He stated that both he and Respondent sought assistance from the OBA in winding down Respondent's practice, to no avail. Lastly, Mr. McLauchlin advised the panel that Respondent's treatment has been successful and that Respondent is presently capable of practice law.[8]

¶ 26. OBA investigator, Sharon Orth, testified that she first met Respondent following his immediate release from Valley Hope. She recalled Respondent came to her office unannounced and advised that he was recently released from the hospital. According to Orth, the purpose of Respondent's visit was to address the grievances lodged against him. Orth recalls that Respondent appeared disheveled and very upset about his family situation and hospital release. Orth required Respondent to sign a medical release form so that she could obtain all of Respondent's medical records from his past and current physicians. Respondent complied and also provided Orth with his new local address.

¶ 27. Lastly, while Orth acknowledged that she spoke with Respondent and Mr. McLauchlin, she denied that either requested the OBA's assistance in winding down Respondent's practice. But, Orth admits that she was unaware that the OBA provided such assistance.

*Stipulated Mitigating Factors*

¶ 28. Respondent contended and the OBA agreed, that several factors should mitigate the severity of discipline to be imposed. First, Respondent answered the Complaint in a timely fashion, after receiving proper notice and service of process. Second, during the time of all complaints herein, Respondent was involved in an acrimonious divorce and custody case with his wife. Third, Respondent was suffering from an undiagnosed bipolar condition during all times relevant to the complaints. Fourth, Respondent has sought and obtained treatment for his bipolar condition, and "has successfully and happily reconciled with his wife." Lastly, Respondent has made full restitution to his clients.

---

7. The record reveals that Mr. McLauchlin sent several letters to the investigator advising the OBA of Respondent's diagnosis and progress.

8. In a report dated August 12, 2009 and again on February 6, 2011, Mr. McLauchlin advised the OBA that Respondent's condition had stabilized.

### PRT Report

¶ 29. The PRT filed its report on April 18, 2011. The panel found that Respondent refused to exercise diligence and timely communicate with clients; was dilatory in the accounting and safekeeping of client funds; failed to supervise non-lawyers; and commingled client funds. Additionally, Respondent failed to timely respond to certain grievances and requests for information from the office of the General Counsel. However, the panel determined that the OBA failed to establish any violations concerning the Fred Moores and Tracy Fields grievances by clear and convincing evidence.[9]

¶ 30. In so finding, the panel recommended the imposition of a public censure, community service, and continued participation in the Lawyers Helping Lawyers program. The panel also recommended that Respondent demonstrate his competence concerning all rules related to use, supervision and management of trust accounts, and demonstrate his understanding of a lawyer's obligation to supervise and monitor non-lawyers in connection with the use of trust accounts. The PRT reasoned that Respondent's undiagnosed medical condition, acrimonious divorce, and custody proceeding prevented Respondent from properly representing his clients and impaired his judgement and decision making abilities. And, while Respondent's actions warrant discipline, the fact that all underlying bar complaints have been resolved, all client retainers have been repaid, and all clients were able to secure subsequent counsel without prejudice, serves to mitigate the severity of Respondent's discipline. The OBA, however, disagrees and urges this Court to suspend Respondent from the practice of law for one year to eighteen months.

### DISCUSSION

¶ 31. Consistent with the parties' stipulations and the evidence presented, the PRT concluded that Respondent's actions violated ORPC Rule 1.3 [10] (diligence), Rule 1.4 [11] (communication), Rule 1.5(c) [12] (client accounting), Rule 1.15 [13] (safekeeping of prop-

9. The OBA urges this Court to adopt the parties' stipulations and the PRT's findings of fact and conclusions of law, as set forth in the PRT report, save the PRT's conclusion that either Respondent or Mr. McLaughlin requested assistance in winding down Respondent's practice.

10. The terms of ORPC Rule 1.3–Diligence, states: A lawyer shall act with reasonable diligence and promptness in representing a client.

11. The terms of ORPC Rule 1.4–Communication, states:
(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

12. The terms of ORPC Rule 1.5(c)-Fees, states in part:

\* \* \* \*

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of determination.

13. The terms of ORPC Rule 1.15–Safekeeping Property, states in part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall

erty), and Rule 5.3 [14] (failure to supervise non-lawyers). In addition, Respondent's failure to timely respond to the lawful demands for information in a bar disciplinary proceeding constituted a violation of ORPC Rule 8.1(b).[15] The PRT further concluded that

Respondent's conduct brought discredit upon the legal profession as described in Rule 1.3 [16] RGDP, and that Respondent failed to adequately respond to the process for investigation of grievances as described in Rule 5.2 [17] RGDP.

> be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
> (b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account but only in an amount necessary for that purpose.
> (c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
> (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
> (e) When in connection with a representation, a lawyer possesses funds or other property in which both the lawyer and another person claim interests, the funds or other property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion of the funds shall be promptly distributed.
> (f) Where funds or other items of property entrusted to a lawyer have been impressed with a specific purpose as to their use, they shall retain that specific character unless otherwise authorized by a client or third person or prohibited by law. Where funds are impressed with a specific purpose, a lawyer may not subject them to a counterclaim, set off for fees, or subject them to a lien.
> * * * *

**14.** The terms of ORPC 5.3–Responsibilities Regarding Nonlawyer Assistants, states in part:

> * * *
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is

> compatible with the professional obligations of the lawyer; and
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

**15.** The terms of ORPC Rule 8.1–Bar Admission and Disciplinary Matters, states:

> * * * *
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

**16.** The terms of RGDP Rule 1.3 addressing discipline for acts contrary to the prescribe standards of conduct, provide:

> The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

**17.** The terms of RGDP Rule 5.2–Investigations, states:

> After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the

¶ 32. After reviewing the record de novo, this Court finds that the tendered stipulations were "made voluntarily and with knowledge of their meaning and legal effect" and are "not inconsistent with any facts otherwise established by the record." *State ex rel. Okla. Bar Ass'n v. Schraeder*, 2002 OK 51, ¶ 8, 51 P.3d 570, 575. This Court's independent and non-deferential review of the PRT's proceedings, exhibits, briefs, and parties' stipulations demonstrates clear and convincing evidence to support the parties' stipulated conduct and the PRT's findings presented in the PRT's report. Therefore, this Court adopts the factual stipulations and the PRT's findings to the extent they are consistent with the discussion below.

¶ 33. Respondent has admitted, and the record adequately reflects Respondent's failure to timely return client "[funds] to which the client [was] entitled and [refund] any advance payment of fee or expenses that has not been earned or incurred." ORPC Rule 1.16(d).[18] The record reveals that although Respondent fully repaid all client retainers and did not retain any of his earned fees, such repayments did not occur, in some instances, until a year after Respondent's representation terminated. This Court finds that Respondent's delay is a violation of ORPC Rule 1.16(d).

¶ 34. The OBA has also alleged that Respondent was derelict in the handling of his office affairs and financial accounting. In particular, the OBA asserted that Respondent failed to properly supervise his employees which allowed them to access the law office's operating and trust accounts for personal use. In so doing, the secretarial staff used a rubber stamp to forge Respondent's signature and cash various checks.

¶ 35. A lawyer is duty-bound to supervise the work of his hired hands. So when a lawyer fails to properly supervise his staff, "particularly when he has knowledge that the employee is engaging in conduct that would violate the Rules of Professional Conduct," that lawyer is guilty of dereliction, *State ex rel. Okla. Bar Ass'n v. Taylor*, 2000 OK 35, ¶ 19, 4 P.3d 1242, 1251, and has violated ORPC 8.4(a).[19] *Id.* "It is the lawyer who has the ultimate responsibility to ensure that the internal processing system of his office is in compliance with his professional obligations." *Id.* This Court finds that Respondent was derelict in failing to properly supervise his staff and has violated ORPC 8.4(a).

¶ 36. Next, the OBA contended that Respondent did not have accounting procedures in place and his office finances were "chaotic." The record reveals that Respondent paid personal bills from the law office's operating account. And, the operating account was overdrawn countless times, including during the time Respondent held Ms. Wickson's settlement funds. This is particularly concerning as the Wickson's settlement funds were mis-deposited into Respondent's operating account, rather than his trust ac-

relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

18. The terms of ORPC Rule 1.16–Declining or Terminating Representation, states:

* * *
(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expenses that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

19. The terms of ORPC Rule 8.4–Misconduct, states:

It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

count. Likewise, Respondent's trust account was overdrawn and used for personal matters. These acts, according to the OBA, constitute conversion, not mere commingling.

¶ 37. A lawyer has a fiduciary duty to properly manage funds entrusted to his care. And, where as here, a lawyer violates that duty, this Court engages three levels of culpability-commingling; simple conversion; and misappropriation. *State ex rel. Okla. Bar Ass'n v. Mayes,* 2003 OK 23, 66 P.3d 398. Commingling, the least egregious, arises from a lawyer's failure to keep his monies separate from that of his client's. But, "when the attorney uses client funds for a purpose other than that for which they are intended," the more serious offense of simple conversion has occurred. *Id.,* ¶ 18, 66 P.3d at 404. Misappropriation, the highest level of culpability, occurs when a "lawyer purposefully deprives a client of [monies] through deceit and fraud." *Id.* Each level of culpability is a violation of a lawyer's fiduciary duty and each must be proven by clear and convincing evidence. *Stutsman,* 1999 OK 62, ¶ 12, 990 P.2d at 861.

¶ 38. The PRT determined and we agree, that the OBA has failed to establish, by clear and convincing evidence, that Respondent intended to either convert or misappropriate client funds. Rather, the record demonstrates Respondent gave control of his client trust account to his office manager, and then failed to supervise the office manager, examine the records or bank statements. As previously stated, Respondent's failure to supervise the management of the account, or to check the records, permitted a substantial client's check to be endorsed by his staff and then mis-deposited and commingled with his personal funds. In addition, the record reveals that despite Respondent's repeated demands on the bank to deny Wife access to the business's accounts, the bank nonetheless continued to cash checks signed by Wife. Although Respondent, on occasion, was not the actor, the acts of his staff, nonetheless, are imputed to his own doing. It is as if Respondent committed the act himself. Respondent's failure, however, may be traced back to his debilitating medical condition. Of equal importance is the fact that upon discovering Wife's mismanagement of the office finances, Respondent employed a CPA to review the firm's records, changed the firm's bank account numbers, and changed the locks to his office on several occasions. This Court is satisfied with the PRT's finding that Respondent merely commingled client funds.

## PUBLIC CENSURE IS AN APPROPRIATE SANCTION FOR RESPONDENT'S PROFESSIONAL MISCONDUCT

¶ 39. Having found clear and convincing evidence of professional misconduct, we now turn to a determination of the appropriate sanction for Respondent's actions. The purpose of a disciplinary proceeding is to ascertain the lawyer's continued fitness to practice law and safeguard the interest of the public, the courts, and the legal profession. *State ex rel. Okla. Bar Ass'n v. Carpenter,* 1993 OK 86, ¶ 16, 863 P.2d 1123, 1129. "Imposition of discipline is designed to foster these aims rather than to be a purely punitive measure imposed for a lawyer's misconduct." *Stutsman,* 1999 OK 62, ¶ 15, 990 P.2d at 860.

¶ 40. The record contains scant evidence of intentional acts of harmful conduct on behalf of Respondent. Respondent, through his staff, negligently commingled his personal funds with his clients' and was dilatory on several occasions in returning client monies. While Respondent's clients suffered no economic harm, Respondent's delay in returning client funds was detrimental to his clients' interest. *See, e.g., Carpenter,* 1993 OK 86, ¶ 17, 863 P.2d 1123, 1130 (where this Court found that although the respondent commingled his personal funds with his client's and was dilatory in returning client monies, no detriment was suffered by the clients as all the monies have been accounted for). Although this Court reviews Respondent's actions in the Rule 6 context, which focuses on Respondent's offending past conduct, it is equally important to consider Respondent's undiagnosed depression as a mitigating factor in fashioning the appropriate level of

discipline.[20]

¶ 41. While depression alone is not sufficient to mitigate discipline, the fact that Respondent recognized his problem; sought, cooperated and successfully completed treatment; and is willing to undergo continued supervision of his condition, are sufficient mitigators to lessen the severity of discipline. In addition, Respondent has expressed remorse and accepted full responsibility for his wrongdoing and the acts of his staff.

¶ 42. This Court agrees with the PRT's recommendation of a public censure and Respondent's continued participation in the Lawyers Helping Lawyers program as an appropriate sanction for Respondent's professional misconduct. A public censure is deemed an acceptable measure of discipline where the harm dealt the client has been fully compensated, *State ex rel. Okla. Bar Ass'n v. Martin*, 2010 OK 66, ¶ 31, 240 P.3d at 702, and where an attorney engaged in no intentional acts of harmful misconduct, *State ex rel. Okla. Bar Ass'n. v. Chapman*, 2005 OK 16, 114 P.3d 414. In addition, this Court has previously imposed a public censure where a lawyer committed similar offenses while suffering from a medical condition accompanied by depression. *See, Chapman*, 2005 OK 16, 114 P.3d 414, *State ex rel. Okla. Bar Ass'n v. Southern*, 2000 OK 88, 15 P.3d 1; *State ex rel. Okla. Bar Ass'n v. Abbott*, 2000 OK 64, 11 P.3d 1239; and *Carpenter*, 1993 OK 86, ¶ 3, 863 P.2d at 1132 (citing a previous unpublished opinion where this Court imposed a private reprimand coupled with the imposition of costs and continued association with a support program for similar offenses). In the instant case, Respondent engaged in no intentional acts of harmful misconduct and voluntarily went to the OBA for help. A public censure is warranted.

## THE IMPOSITION OF COSTS

¶ 43. "The appropriateness of assessing costs hinges on whether the professional misconduct charges have been proven by clear and convincing evidence and whether the costs are related to a violation of a rule of professional conduct or disciplinary rule." *State ex rel. Okla. Bar Ass'n v. Albert*, 2007 OK 31, ¶ 27 n. 33, 163 P.3d 527, 538. "If the Bar fails to prove allegations by clear and convincing evidence, costs should not be assessed." *Id. citing State ex rel. Okla. Bar Ass'n v. Armstrong*, 1992 OK 79, ¶ 7, 848 P.2d 538, 540. When some of the charges have been proven but others have not, this Court has reduced the costs proportionately. *See e.g., State ex rel. Okla. Bar Ass'n v. Funk*, 2005 OK 26, 114 P.3d 427 (costs reduced proportionately when respondent prevailed on two of three counts); *State ex rel. Okla. Bar Ass'n v. Dobbs*, 2004 OK 46, 94 P.3d 31 (costs reduced proportionately when respondent had been exonerated in five of fifteen counts); *State ex rel. Okla. Bar Ass'n v. Israel*, 2001 OK 42, 25 P.3d 909 (costs reduced by two thirds when respondent prevailed on two of three counts).

¶ 44. In this matter, the Bar seeks reimbursement of costs in the amount of $4,925.39 against Respondent. Respondent prevailed on three of the fourteen counts asserted against him. Therefore, the requested costs are reduced proportionately to the amount of $3,869.94 as to Respondent and must be paid no later than one hundred twenty days from the date this opinion becomes final.

## RESPONDENT PUBLICLY CENSURED; COSTS ASSESSED.

CONCUR: COLBERT, V.C.J.; KAUGER, WATT, WINCHESTER, EDMONDSON, REIF, COMBS, GURICH, JJ.

DISSENTS: TAYLOR, C.J.

KAUGER, J., concurring:

This should have been a Rule 10 proceeding.

TAYLOR, C.J., dissenting:

I would suspend this Respondent from the practice of law.

---

**20.** This Court may consider a lawyer's incapacity to practice law in a Rule 6 proceeding. *See State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, 848 P.2d 543.