2005 OK 16

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Christi Ann CHAPMAN, Respondent.**

No. 4809.

Supreme Court of Oklahoma.

March 15, 2005.

Loraine Dillinder Farabow, Oklahoma City, OK, for Oklahoma Bar Association.

Christi Ann Chapman, Madill, OK, pro se.

## COLBERT, J.

¶ 1 Complainant, Oklahoma Bar Association, filed a four-count complaint against Respondent, Christi Ann Chapman. A panel of the Professional Responsibility Tribunal (PRT) considered the complaint on facts and conclusions of law which were stipulated by the parties. The panel unanimously recommended that Respondent be publicly censured and assessed the costs of these proceedings. Also, some additional requirements were recommended. This Court has reviewed this matter *de novo* and imposes the recommended discipline of public censure along with the assessment of costs.

¶ 2 Respondent is a sole practitioner in Madill, Oklahoma. She was admitted to the Oklahoma Bar in 2000. She partnered with her uncle until he was suspended for two years and one day in September, 2001. The grievances against Respondent arose from her actions from around that time through 2003. She has received no prior discipline.

### MUNOZ GRIEVANCE

¶ 3 Marilyn Munoz paid Respondent $150.00 to file a small claims case arising from a car repair. After several months, Munoz learned the action had not been filed. Respondent told Munoz she needed to pay the remaining $100.00 of Respondent's fee before Respondent would file the petition she had prepared. Munoz asked Respondent to drop the suit and give her a refund. When Munoz persisted, Respondent agreed to refund $60.00. Respondent was unable, however, to find a current address or telephone number for Munoz.

¶ 4 Munoz filed a grievance with Complainant and a formal investigation was opened. Respondent was served with the grievance by mail and was instructed to answer within twenty days. She failed to respond to that request or to a subsequent request sent by certified mail. As a result, Respondent was deposed. She admitted that she failed to return the Munoz refund and that she failed to respond to Complainant's inquiries. She attributed her unintentional misconduct to the overwhelming medical and personal circumstances she was experiencing at the time. Neither Respondent nor Complainant have been successful in attempts to locate Munoz.

### CARTER GRIEVANCE

¶ 5 Tiffany Carter and her husband hired Respondent to represent them in their "uncontested" divorce. They paid Respondent $250.00 of the agreed fee of $300.00 to formalize the agreement they had reached concerning property division, child support, and visitation arrangements.

¶ 6 When the Carters tried to make contact with Respondent in order to sign the documents, they found that Respondent's office was closed and the office telephone had been disconnected. When they were able to reach her, Respondent explained that she had been ill. She promised to deliver the documents for their signatures. Respondent delivered incomplete documents with a letter explaining that the Carters were disputing facts from each other regarding child support figures and that she needed a single answer with which to file the divorce petition. The Carters were again unable to make contact with Respondent. They hired another lawyer to complete their divorce and Tiffany Carter filed a grievance.

### PRUIT GRIEVANCES

¶ 7 A grievance was received from J.B. Pruit. The substance of the grievance is not the basis of this complaint. Complainant sent a letter to Respondent stating that it was treating the grievance as an informal complaint. Respondent was directed to make contact with Pruit and to send a copy of her correspondence to Complainant. A copy of Complainant's letter to Respondent was sent to Pruit.

¶ 8 Respondent failed to make contact with Pruit and he submitted a second grievance.

This time, Complainant gave Respondent five days to make contact with Pruit. When Pruit filed the third grievance, Complainant opened the matter for formal investigation and requested a response. Respondent never responded to the request. She also failed to respond to subsequent requests for information concerning the Pruit grievances.

## NEAL GRIEVANCE

¶ 9 This grievance came from the mother of a client of Respondent. The man was convicted of offenses related to his sexual relationship with an eleven-year-old girl. The essence of the mother's grievance was that the penalty her son received was too severe. As with the Pruit grievance, Respondent is not being disciplined for any conduct leading to the grievance except for Respondent's failure to respond to Complainant's inquiries regarding the grievance.

¶ 10 Respondent failed to respond to the letter advising her that Complainant was opening the Neal grievance for formal investigation. When Complainant's investigator made contact with Respondent, she sought and received additional time to respond. Her response was not complete and Complainant requested a supplemental response within ten days. No supplemental response was ever received and a second letter by certified mail was returned "unclaimed."

## STIPULATED CONCLUSIONS OF LAW

¶ 11 Consistent with the stipulations of the parties, the PRT concluded that Respondent's actions violated Rule 1.3 (diligence), Rule 1.4 (communication with client), Rule 1.15 (safekeeping property), Rule 1.16(d) (protecting client interests upon termination of representation), Rule 8.1(b) (failing to respond to a lawful demand for information from a disciplinary authority), and Rule 8.4(a) (violating a disciplinary rule) of the Rules of Professional Conduct, Okla. Stat. tit. 5, ch.1, app. 3–A (2001). The PRT further concluded that Respondent's conduct brought discredit upon the legal profession as described in Rule 1.3 of the Rules Governing Disciplinary Proceedings, Okla. Stat. tit. 5, ch.1, app.1–A (2001)(RGDP), and that Respondent failed to adequately respond to the process for investigation of grievances described in Rule 5.2 RGDP.

¶ 12 This Court has reviewed the proceedings *de novo* and finds that the tendered stipulations were "made voluntarily and with knowledge of their meaning and legal effect" and are "not inconsistent with any facts otherwise established by the record." *State ex rel. Oklahoma Bar Ass'n v. Schraeder,* 2002 OK 51, 51 P.3d 570, 575. The record contains clear and convincing evidence to demonstrate the violations stipulated by the parties and presented in the PRT report.

## DISCIPLINE

¶ 13 The PRT has recommended public censure for Respondent's client neglect and her failure to timely and adequately respond to the disciplinary process. "This Court has imposed varying degrees of discipline on lawyers who neglected client matters. The discipline imposed has ranged from public censure to suspension." *State ex rel. Oklahoma Bar Ass'n v. Vincent,* 2002 OK 40, 48 P.3d 797, 802 (citations omitted). "Where ... an attorney is guilty of neglect of a legal matter without affirmative acts of harmful conduct, the appropriate discipline is public censure." *State ex rel. Oklahoma Bar Ass'n v. Borders,* 1989 OK 101, 777 P.2d 929, 930.

¶ 14 There is scant evidence of intentional acts of harmful conduct in the record of this proceeding. Further, Respondent's depression, health problems, and personal circumstances serve to mitigate the severity of discipline to be imposed.

¶ 15 From approximately July 29, 2001, until January, 2004, Respondent had significant situations occur in her life. Her home and its entire contents were destroyed by fire, several family members died, her law partner was suspended from the practice of law, she was married, separated, and divorced, and she suffered repeated bouts of significant physical illness. Her illness included hospitalization for a week as a result of a staph infection in the cartilage of her ear. The infection spread to her jaw causing a large abscess on her face and neck. Respondent's hospitalization was followed by a

week of bed rest, half days of work for a number of weeks, and a long recovery period. She remained on antibiotics for several weeks.

¶ 16 As a result of these events, Respondent became depressed and experienced difficulty recognizing that she was ill and needed assistance. In August, 2002, Respondent was diagnosed as suffering from major depression. She was prescribed medication and received counseling.

¶ 17 Today, Respondent's depression and physical health problems are under control and are monitored by her doctor. She has altered her lifestyle and business practices in order to minimize the amount of work and stress to which she is exposed. Respondent has been cooperative during the disciplinary proceedings and has expressed sincere remorse for her misconduct.

¶ 18 This Court adopts the PRT's recommendation that a public censure and payment of costs is an appropriate discipline to be imposed for Respondent's professional misconduct. By way of reminder, this Court repeats the admonition found in *State of Oklahoma ex rel. Oklahoma Bar Association v. Southern*, 2000 OK 88, 15 P.3d 1. There, a public censure was imposed for a lawyer's neglect of client matters which resulted from a medical condition accompanied by depression. "It is important that all members of the bar understand that while a disabling medical condition may in some instances mitigate misconduct, the illness may not excuse the attorney's failure to terminate his services or seek assistance when his legal performance falls below the required standard of competent representation." *Id.* at 8.

¶ 19 Respondent is publicly censured and ordered to pay the costs of this proceeding in the amount of $1,246.77 within ninety days of the effective date of this opinion. It is hoped that Respondent will immediately make contact with the Oklahoma Bar Association Mentoring Committee and request that a mentor be assigned to her. She should also make contact with Lawyers Helping Lawyers, request assistance, and should abide by any recommendations made.

RESPONDENT PUBLICLY CENSURED; COSTS ASSESSED.

WINCHESTER, V.C.J., LAVENDER, OPALA, EDMONDSON and TAYLOR, JJ., concur.

HARGRAVE, J., concurs in result.

WATT, C.J. and KAUGER, J., concur in part, dissent in part.

KAUGER, J., concurring in part and dissenting in part.

¶ 1 I concur in the majority's imposition of costs [1] against the respondent, Christi Ann Chapman (attorney), and in its suggestion that she immediately contact both the Oklahoma Bar Association's Mentoring Committee and Lawyers Helping Lawyers. Nevertheless, I dissent because: 1) it is undisputed that all allegations of misconduct resulted from the attorney's personal incapacity to practice law mandating that the cause be handled as a Rule 10 [2] proceeding; 2) there is no clear and convincing evidence of misconduct in support of three of the four counts pressed by the complainant, Oklahoma Bar Association (Bar Association); and 3) although the attorney stipulated to the recommended discipline of a public reprimand, her testimony indicates that she did not believe the sanction either lenient or appropriate for her actions. A private reprimand, coupled

1. Rule 6.16, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A. See also, Rule 10.3(a), Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; Rule 10.11(c), Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

2. Rule 10.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A provides in pertinent part:
   "The term 'personally incapable of practicing law' shall include:

   (a) Suffering from mental or physical illness of such character as to render the person afflicted incapable of managing himself, his affairs or the affairs of others with the integrity and competence requisite for the proper practice of law;
   (b) Active misfeasance or repeated neglect of duty in respect to the affairs of a client, whether in matters pending before a tribunal or in other matters constituting the practice of law . . ."

with the majority's other conditions, would be sufficient to impress the attorney of the seriousness of the matter and to protect the public.

## I.

¶2 AS THE PROSECUTORIAL ARM OF THE COURT, IN DISCIPLINARY MATTERS, THE BAR ASSOCIATION IS RESPONSIBLE FOR DETERMINING, IN THE FIRST INSTANCE, WHETHER ACTS OF MISCONDUCT SHOULD BE BROUGHT AS RULE 6 OR RULE 10 PROCEEDINGS. WHEN IT IS CLEAR THAT AN ATTORNEY'S ACTIONS ARISE OUT OF A PERSONAL INCAPACITY TO PRACTICE LAW, THE CAUSE SHOULD BE PURSUED UNDER RULE 10.

¶3 It is uncontested that in a period spanning approximately two and one-half years, the attorney: 1) lost her home and all her possessions in a fire; 2) had several family members with extended illnesses resulting in death; 3) started practicing with an uncle who almost immediately was suspended from the practice of law; 4) was married, separated, and divorced; 5) suffered such a severe staph infection in her ear, face and neck that she was hospitalized and when released still required bed rest and could only return to practice on a limited schedule—not only did the cartilage in her ear become infected, the infection spread to her jaw and she had resultant scarring from the infection on her face and her neck; 6) was diagnosed as having a pre-cancerous condition; and 7) sank into a deep and extended depression requiring medication and alterations in her life style. Nevertheless, despite awareness that the facts of this cause would justify proceeding under Rule 10[3] and acknowledging that, when contacted about the grievance, the attorney was incapable of responding,[4] the Bar Association filed this cause as a Rule 6 proceeding.[5]

¶4 It is clear from the record that the Bar Association advised the attorney that she was entitled to assert a Rule 10 defense for personal incapacity to practice law.[6] It is also apparent that the Bar Association recognized that the attorney was incapable of responding to the grievances and to effectively practice law during the period of her illness and depression.[7] Although the attorney rejected

---

3. *Id.*

4. Transcript of proceedings, July 7, 2004, closing statement by Bar Association, providing in pertinent part at pp. 68–69:

   "... Within a year of [the lawyer] taking the bar and becoming licensed, her uncle, who she had started practicing law with, loses his license to practice.
   She then has her house literally burn down to the ground, goes through a horrible marriage, a horrible divorce, several family members being ill and then dying, and then her own illness and hospitilization.
   I can tell you that in almost five years of practicing, that I've seen far more seasoned attorneys, veteran attorneys with a much larger support network of working in a firm, of having support staff, do far worse things to clients than not responding to the Bar Association or not calling a client quickly back.
   I believe that the mitigating circumstances in this case far outweigh the aggravating. Ms. Chapman's failure to respond to the bar was not willful. It was not like her uncle, she didn't thumb her nose at the bar, and say, I don't want to, fellas, so I'm not going to answer you. She couldn't. When she was able

to, she did respond and she gave us everything that she could...."

   Transcript of proceedings, July 7, 2004, questions posed by Bar Association, providing in pertinent part at p. 39:

   "... Q One thing that we did not discuss that I just thought of is the fact that we did not bring this as a Rule 10 proceeding, which you understand, Rule 10 is a disciplinary proceeding that the general counsel's office brings because we believe the person is incompetent, mentally or physically, from being able to practice law. You and I had also discussed at various times that you have the right to try to assert a Rule 10 defense if you believed it was appropriate or beneficial to your case, and you chose not to do that?
   A. No...."

5. Rule 6, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

6. *Id.*

7. See note 4, supra. See also, *Keating v. Edmondson*, 2001 OK 110, ¶9, 37 P.3d 882; *World Publishing Co. v. White*, 2001 OK 48, ¶19, 32 P.3d 835; *Oklahoma Urban Renewal Auth. v.*

the opportunity to raise an incompetency defense, it was not her responsibility to determine how the Bar Association would proceed.

¶ 5 In disciplinary matters, the Bar Association exercises a prosecutorial power [8] subject to this Court's *de novo* review.[9] Once the Bar Association recognized the attorney's incompetency, it should have proceeded under the appropriate disciplinary guidelines—Rule 10.[10]

## II.

¶ 6 THE ONLY CLEAR AND CONVINCING RECORD EVIDENCE OF MISCONDUCT RELATES TO THE ATTORNEY'S INTERACTION WITH A SINGLE CLIENT. THERE IS NO CLEAR AND CONVINCING EVIDENCE TO SUPPORT THREE OF THE COUNTS PRESENTED.

¶ 7 The Bar Association received complaints from four clients: Marilyn Munoz; Tiffany Carter; J.B. Pruitt; and Jeremy Neal. It conceded that two of the four complaints were processed as only "failure to respond" allegations rather than as matters

involving client misconduct.[11]  Furthermore, the only record evidence arising to the clear and convincing standard [12] supporting imposition of discipline is found in the attorney's deposition taken on March 3, 2003.  The testimony refers almost entirely to the attorney's dealings with only one client—Marilyn Munoz.

¶ 8 The Bar Association asserts the clear and convincing evidentiary standard is met by the joint stipulations, testimony and the one hundred and sixteen exhibits offered. Although stipulations may serve as a substitute for record evidence in a disciplinary proceeding,[13] this Court possesses exclusive original jurisdiction in disciplinary matters.[14] We are not bound by agreed stipulations, findings, conclusions of law or recommendations for discipline.[15]  Rather, the ultimate responsibility for imposition of professional discipline is ours alone.  The Court's review is *de novo* in considering the record presented as well as the recommendations for discipline.[16]  Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[17] Here, the evidence is simply deficient as it relates to three of the four client misfeasance allegations.

*Medical Technology & Research Auth. of Oklahoma*, 2000 OK 23, ¶ 14, 4 P.3d 677.

**8.** *State ex rel. Oklahoma Bar Ass'n v. Caldwell*, 1994 OK 57, ¶ 4, 880 P.2d 349; *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, ¶ 10, 624 P.2d 1049.

**9.** *State ex rel. Oklahoma Bar Ass'n v. Mayes*, 2003 OK 23, ¶ 17, 66 P.3d 398; *State ex rel. Oklahoma Bar Ass'n v. Israel*, 2001 OK 42, ¶ 13, 25 P.3d 909; *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 14, 23 P.3d 268.

**10.** Rule 10.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A, see note 2, supra.

**11.** See note 4, supra.  See also, *Keating v. Edmondson*, note 7, supra; *World Publishing Co. v. White*, note 7, supra; *Oklahoma Urban Renewal Auth. v. Medical Technology & Research Auth. of Oklahoma*, note 7, supra.

**12.** *State ex rel. Oklahoma Bar Ass'n v. Mayes*, 2003 OK 23, ¶ 17, 66 P.3d 398; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, ¶ 1,

937 P.2d 988; *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, ¶ 1, 895 P.2d 707.

**13.** *State ex rel. Oklahoma Bar Ass'n v. Schraeder*, 2002 OK 51, ¶ 8, 51 P.3d 570.

**14.** Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 12, supra; *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 1989 OK 16, ¶ 5, 770 P.2d 892.

**15.** *State ex rel. Oklahoma Bar Ass'n v. Erickson*, 2001 OK 66, ¶ 14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel*, see note 9, supra.

**16.** *State ex rel. Oklahoma Bar Ass'n v. Israel*, see note 9, supra; *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 14, 23 P.3d 268; *State ex rel. Oklahoma Bar Ass'n v. Dershem*, 2001 OK 7, ¶ 12, 21 P.3d 639.

**17.** Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. A; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, see note 12, supra; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 12, supra.

## III.

¶ 9 **THE ATTORNEY SHOULD NOT BE BOUND BY HER STIPULATION TO DISCIPLINE IN THE FORM OF A PUBLIC REPRIMAND WHEN HER TESTIMONY INDICATES THERE MAY HAVE BEEN COERCION ASSOCIATED WITH THE STIPULATION AGREEMENT.**

¶ 10 The attorney agreed to discipline through a joint stipulation with the Bar Association in which she conceded that a public censure and payment of costs would be appropriate.[18] Nevertheless, when the attorney was questioned about whether she considered a public censure lenient under the facts presented, she responded that she did not. The attorney was particularly concerned that, especially with the stigma of her law partner already having been suspended, it would result in her being put under unnecessary stress—a situation she sought to avoid in order to ensure that she continues to practice law ethically and responsibly.[19] Furthermore, the Bar Association acknowledged that the attorney would be painted with the broad brush of disdain associated with her uncle's actions.[20] The facts, coupled with the attorney's testimony concerning whether a public censure should issue, causes concern that the stipulations may not have been entered freely. Rather, the agreement may well have resulted from feelings of coercion or because the attorney believed that failure to agree would result in the Bar Association seeking a stiffer penalty.

18. Exhibit 1, Joint Stipulations, entered on July 7, 2004, providing in pertinent part:

"... 88. The parties recommend that a public censure and payment of costs is an appropriate discipline to be imposed for Respondent's professional misconduct based upon the Oklahoma Supreme Court's opinion in *State ex rel. Oklahoma Bar Association v. Southern*, 2000 OK 88, 15 P.3d 1...."

19. Transcript of proceedings, July 7, 2004, the attorney testifying in pertinent part at pp. 33–35:

"... Q And if they are lenient enough to recommend a public censure with or without some terms of probation or condition, such as contacting Lawyers Helping Lawyers and/or having an in-office audit or consultation with Jim Calloway's office, would you think that a public censure is a lenient form of discipline?
A Well, considering all, I don't know that I think it's a lenient form of discipline, because—I mean, there's a lot that goes into it. You know, with Jody and all that he went through and the stupid things that he did, and the mistakes that he made, you know, for everybody to see this public censure is going to mean that they double check everything I do and—
You know, and that it's going to be—it's not—I don't think it's going to be—I think it may be—you know, I don't mind the double checking, I don't mind that part of it, but I don't think it's lenient, considering all the people that I've talked to that know about my situation—
Q Sure.
A—and what I feel like that they will do with the information of a public censure. I don't feel like that it's—I'm walking away scot-free by any stretch of the imagination.
Q So you take that very seriously at this—
A Yes.
Q —tribunal, and if the Court gave you a public censure, recommended a public censure and then ordered it, that would be a serious discipline in your eyes?
A Yes.
Q Based on the stigma that you already feel that you have to practice under, from being Jody Minter's niece, correct?
A Yes. Because it's like they expect me to mess it up or expect me to try to skirt this or do this differently or wrong or not exactly take care of this. And so, you know, I feel like I'm having to prove that I'm not that on a daily basis, and to have this added to my—at least the pressure I put on myself, I do not feel like that that would—it's not something I would enjoy, but it's something that I will deal with if I need to...."

20. Transcript of proceedings, July 7, 2004, closing statement by Bar Association, providing in pertinent part at p. 69:

"... She already lives with the stigma of being Jody Minter's niece, of practicing with those expectations—negative expectations already on her in a very small town. Everyone knows about this, everyone is talking about this, the other people in the bar journal—who get the bar journal and read about this if a public censure is recommended by this tribunal, and if the Supreme Court imposes such a discipline...."

## IV.

¶ 11 **A PRIVATE REPRIMAND, COUPLED WITH THE SUGGESTION TO CONTACT THE MENTORING COMMITTEE AND LAWYERS HELPING LAWYERS, WOULD BE SUFFICIENT TO IMPRESS THE ATTORNEY OF THE SERIOUSNESS OF THE MATTER AND TO PROTECT THE PUBLIC.**

¶ 12 The stipulation for discipline entered by the parties relies on a single case for the imposition of a public censure—*State ex rel. Oklahoma Bar Ass'n v. Southern*, 2000 OK 88, 15 P.3d 1. Interestingly enough, the Bar Association went to great lengths in the hearing before the trial panel to distinguish the attorney's conduct from that considered in *Southern*.

¶ 13 As the Bar Association pointed out, *Southern* involved: 1) five cases of serious neglect—here, the majority recognizes that the record presents no affirmative acts of harmful conduct; and 2) a seasoned practitioner—while the attorney here was licensed in 2000 and, within in a year of taking the Bar, the partner with whom she associated lost his license to practice law. Furthermore, the Bar Association recognized that the mitigating factors were among the most compelling ever presented and may well have caused even seasoned attorneys to have fal-

tered in their services to clients.[21] Two other factors distinguish this cause from *Southern*. The first is that the attorney here has been absolutely candid with the Bar Association while Southern was not. The second is that, although the attorney here acknowledged difficulties with getting information from a client, she did not denigrate the client's claim or the client's commitment to prosecuting the same as did Southern.

¶ 14 The responsibility of this Court in disciplinary proceedings is not to punish but to inquire into and to gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts and of the legal profession.[22] Under the facts presented, a private reprimand, coupled with the other suggestions of the majority, would suffice to both impress the attorney with the seriousness of her neglect and to protect the public interest.

## CONCLUSION

¶ 15 The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of legal practitioners is solely vested in this Court.[23] It is our responsibility to conduct a full-scale exploration of all the relevant facts.[24] A practitioner's incapacity is important in crafting solutions that accord with the law's imperative of ensuring protection of the public from substandard lawyers.[25]

---

**21.** Transcript of proceedings, July 7, 2004, closing statement by Bar Association, providing in pertinent part at pp. 66–67:

"... And, I think it is something that needs to be said to this tribunal that in Southern's case, there were five cases of serious client neglect....
If you compare Mr. Southern in all the years that he had practiced law and compare it to Ms. Chapman's, you have a relatively young attorney here who was just licensed in 2000. Within a year of her taking the bar and becoming licensed, her uncle, who she had started practicing law with, loses his license to practice.
She then has her house literally burn down to the ground, goes through a horrible marriage, a horrible divorce, several family members being ill and then dying, and then her own illness and hospitalization.
I can tell you that in almost five years of practicing, that I've seen far more seasoned attorneys, veteran attorneys with a much larg-

er support network of working in a firm, of having support staff, do far worse things to clients than not responding to the Bar Association or to calling a client quickly back...."

**22.** *State ex rel. Oklahoma Bar Ass'n v. Bolton*, 904 P.2d 597, 602 (Okla.1995); *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 848 P.2d 543, 545 (Okla.1992); *State ex rel. Oklahoma Bar Ass'n v. Colston*, 777 P.2d 920, 925 (Okla.1989); *State ex rel. Oklahoma Bar Ass'n v. Moss*, 682 P.2d 205, 207 (Okla.1983).

**23.** *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 12, supra; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 8, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n*, see note 8 at ¶ 4, supra.

**24.** *State ex rel. Oklahoma Bar Ass'n v. Carpenter*, ˇ1993 OK 86, ¶ 11, 863 P.2d 1123.

**25.** *Id* at ¶ 16.

¶ 16 Clear and convincing evidence of attorney misconduct was presented in only one of the client-related causes pressed. The client has suffered no harm and the attorney would be willing to return monies due the client if the attorney could locate her. The main thrust to this cause has been a failure to respond to the Bar Association's inquiries—something the Bar Association has recognized that incapacity caused. A public reprimand is too severe a penalty for illness.

¶ 17 I would convert this matter to a Rule 10 proceeding. In addition to the majority's encouragement that the attorney contact the Oklahoma Bar Association's Mentoring Committee and Lawyers Helping Lawyers, I would issue a private reprimand and impose costs. The majority's failure to treat this cause as a Rule 10 proceeding, in a situation where the facts undoubtedly warrant a finding of personal incapacity, raises the question of whether such proceedings are ever appropriate or will be employed.