OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ZANNOTTI

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ZANNOTTI
2014 OK 25
326 P.3d 496
Case Number: SCBD-6019
Decided: 04/08/2014
As Corrected: June 17, 2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 25, 326 P.3d 496

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, 
Complainant,
v.
MARK ANDREW ZANNOTTI, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 The Oklahoma Bar Association filed a complaint against Respondent alleging 
violations of Rule 8.4(b) of the Oklahoma Rules of Professional Conduct (ORPC), 
5 O.S.2011, ch. 1, app. 3-A, and Rule 1.3 of the Rules Governing Disciplinary 
Proceedings (RGDP), 5 O.S.2011, ch. 1, app. 1-A. The basis of the complaint was 
respondent's nolo contendere plea to domestic assault and malicious 
injury to property and a protective order entered against him. The parties 
stipulated to the facts and agreed to a recommended discipline of public censure 
and probation. The Professional Responsibility Tribunal found that Respondent 
had violated the ORPC and RGDP as alleged and recommended a public censure and 
probation until January 20, 2015.

RESPONDENT SUSPENDED;
MOTION TO ASSESS COSTS 
DENIED.

Loraine Dillinder Farabow, Assistant General Counsel, Oklahoma Bar 
Association, Oklahoma City, Oklahoma, for Complainant.
Charles F. Alden, 
Oklahoma City, Oklahoma, for Respondent.


TAYLOR, J.
¶1 The Oklahoma Bar Association (OBA) filed a complaint against attorney Mark 
Andrew Zannotti (Respondent). The OBA alleges Respondent violated Rule 8.4(b)[1] of the Oklahoma 
Rules of Professional Conduct (ORPC), 5 O.S.2011, ch. 1, app. 3-A, and Rule 
1.3[2] of the 
Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, ch. 1, app. 1-A, 
and that he should be disciplined. The parties entered into stipulations of 
facts, including that Respondent pled nolo contendere to charges of 
domestic violence and destruction of another's property and is under a 
protective order, and recommended a public reprimand with a period of probation. 
The Professional Responsibility Tribunal (PRT) held a hearing and filed a report 
finding that Respondent had violated the ORPC and RGDP and recommending that 
Respondent should be disciplined by public reprimand with probation.
¶2 The first issue before this Court is whether Respondent violated the 
ORPC's and the RGDP's rules governing attorneys' conduct. If so, the second 
issue is what discipline should be imposed on Respondent. We find that 
Respondent has violated the ORPC's and the RGDP's rules governing attorney 
conduct. We determine the proper discipline to be suspension from the practice 
of law for two years if Respondent successfully completes the requirements of 
the order deferring the sentence and judgment, subject to reconsideration if the 
judgment and sentencing are accelerated.
I. REVIEW OF PRT PROCEEDING AND RECORD
¶3 This Court has original and exclusive jurisdiction over bar disciplinary 
matters. Rule 1.1, RGDP. This Court's review of the proceeding before the PRT is 
de novo. State ex rel. Okla. Bar Ass'n v. Donnelly, 1992 OK 164, ¶ 11, 848 P.2d 543, 545. In our de 
novo review, we examine the record and assess the weight and credibility of 
the evidence. Id. This Court is not bound by the parties' admissions, the 
parties' stipulations, or the PRT's findings of facts and misconduct or 
recommendations of discipline. Id.
¶4 The record includes the parties' stipulations, a transcript of the PRT 
hearing, and documentary evidence. Factual stipulations that are consistent with 
the record are adopted by this Court; to the extent the stipulations are 
inconsistent with the record, they are rejected. See State ex rel. Oklahoma 
Bar Ass'n v. Chapman, 2005 OK 
16, ¶¶ 11-12, 114 P.3d 414, 
416. Here, the stipulated facts present an incomplete account of the facts and 
of Respondent's misconduct.
II. BACKGROUND FACTS
¶5 On November 9, 2009, J.D. retained Respondent as her attorney in her 
divorce proceeding. On October 3, 2010, J.D. and Respondent began a sexual 
dating relationship although both were married and Respondent was still 
representing J.D. On November 3, 2010, Respondent filed an application to 
withdraw as J.D.'s attorney; the application was granted on November 4, 2010. 
The couple dated off and on until September 4, 2011.
¶6 The following undisputed testimony was presented at the trial in State 
v. Zannotti, No. CM-2012-3988 (D.Ct. Tulsa County Jan. 28, 2013). On or 
before October 26, 2011, while J.D. was away on a business trip and then on her 
way home, Respondent sent J.D. text messages which show that Respondent was in a 
needy, jealous state of mind; and J.D. responded to several, but not all, of the 
text messages.[3] J.D. and Respondent agreed to meet at her house 
because Respondent was "wanting to get back together." Respondent let himself 
into J.D.'s house through an unlocked back door as she had instructed him. When 
J.D. arrived home and to her surprise, her garage door was open with 
Respondent's car parked inside. Even though they were not dating at the time, 
Respondent opened J.D.'s car door and kissed her. Then Respondent reached inside 
the car, grabbed her phone, smashed it in the driveway, and said, "You don't 
need this. You just need to pay attention to me."
¶7 J.D. and Respondent went into the kitchen where an argument began. When 
Respondent went into the backyard, J.D. got in her car and attempted to leave. 
Respondent came into the garage, pulled the keys out of the car, and pulled J.D. 
out of the car and into the kitchen. After J.D. saw Respondent's phone on the 
counter, she encouraged Respondent to smash his phone like he had smashed her 
phone. When Respondent went outside with his phone, J.D. grabbed a cordless 
phone and ran upstairs to the bathroom.
¶8 Respondent came up the stairs and into the bathroom, pulled J.D. into the 
bedroom, and pushed her onto the bed. J.D. started screaming for Respondent to 
leave which upset him even more. Respondent then lifted J.D. up by her 
shoulders, threw her into the bedroom wall and head-butted her in the face, 
causing a gash across her nose and giving her two black eyes.
¶9 J.D. convinced Respondent to let her go downstairs to get some ice for her 
nose, and Respondent followed her into the kitchen. Respondent pushed J.D. back 
upstairs where he ordered her to undress and where he undressed.[4] Respondent ordered J.D. to 
lie down on the bed, got atop her, and put his hands around her neck tightly 
several times. During this time, Respondent asked her if she loved him and would 
marry him. In an attempt to pacify Respondent, J.D. replied, "Yes." Respondent 
also asked J.D. for the last name of her male friend and said that he was going 
to kill him. Finally, Respondent began to calm down, and J.D. was able to kick 
him off the bed. Respondent stood up and asked J.D. if she wanted him to leave. 
She grabbed her dress, put it back on, and answered, "yeah." While Respondent 
was dressing, J.D. ran down the stairs, ran out the front door to a neighbor's 
house, and called 911.
¶10 After the police arrived and questioned J.D., she went to a friend's 
house to stay. J.D. was out of town the next few days. When she returned home, 
J.D. filed for a protective order. The district attorney filed charges against 
Respondent for misdemeanor domestic abuse assault and battery,[5] and malicious injury to 
property.[6]
¶11 On August 8, 2012, a criminal information was filed. Respondent was 
charged in Count I of the Information as follows:

 
 MARK ANDREW ZANNOTTI, on or about 10/26/2011, in Tulsa 
 County, State of Oklahoma and within the jurisdiction of this Court, did 
 commit the crime of DOMESTIC ASSAULT & BATTERY, a Misdemeanor, by 
 unlawfully, willfully and wrongfully, commit an assault and battery upon the 
 person of one [J.D.], a person with whom the defendant was in a dating 
 relationship, by then and there pushing and shoving her and striking her 
 about the face with force and violence and with the unlawful intent to do 
 her corporal hurt and bodily injury . . . .
Count II charged that Respondent "unlawfully, willfully, maliciously and 
wrongfully" injured and defaced J.D.'s phone by "taking the phone and breaking 
it with the deliberate and malicious and wrongful intent to injure property of 
said owner."[7] 
Respondent pled nolo contendere to the criminal charges.
¶12 J.D. testified in the criminal proceeding that, since the incident, she 
had not stayed alone at night in her house, was seeing a counselor, was taking 
medication to calm her, and was frightened of running into Respondent.[8] She testified 
that he had never before exhibited violent behavior, and she would not have 
expected such behavior from him. The judge deferred the sentencing for two 
years, stating: "When the prosecutor is recommending situations where they want 
probation in the amount -- in the amount of one year, I get exactly the same 
punishment by extending it and -- not punishment, but safety of the -- of the 
community and punishment, by extending it. And the only way I can do that is 
with a deferred sentence."[9]
¶13 At the hearing before the PRT, OBA counsel asked Respondent the following 
question:

 
 And her proffer to the Court regarding the factual basis for the plea was 
 that the State's evidence would show that on October 26, 2011, that the 
 Defendant, while at the home of the victim, [J.D.] - - I'm going to skip 
 through the address - - that he grabbed her arm, pushed her, head-butted her 
 in the face and threw her down, and that the Court added, and allegedly 
 grabbed her phone earlier, threw it in the driveway, breaking it and having 
 it skid into the yard. Is that also true? And then the Court asked you, "Is 
 that the evidence you're telling me that I should accept as true although 
 you're not admitting to any part of it?"
Respondent answered: "Yes." Then OBA counsel asked: "And was that, in fact, 
what you entered the plea to?" Respondent again answered: "Yes." Respondent 
stated that he had put his hands on J.D. inappropriately but that he had not 
done everything she said he did without elaborating.[10]
¶14 Respondent testified that J.D. convinced him that "maybe it would work." 
He further testified that "she wanted me to come over on the 26th after I picked 
her up from the airport a couple of weeks before. . . ." The text messages do 
not support Respondent's testimony that it was J.D. who wanted to continue the 
relationship. The text messages, see Appendix A, show that Respondent was 
the one insisting on he and J.D. meeting on October 26.
¶15 Respondent has paid for the cell phone, started counseling even before 
the criminal charges were filed, and has cooperated with the OBA in its 
investigation. He states that he is embarrassed by his behavior, understands how 
he has hurt people, understands that he has brought disrepute upon the legal 
profession, and is sure he will never act in the same way again.
¶16 The parties stipulated to the following mitigation: Respondent has 
practiced for nineteen years without discipline by this Court, he has cooperated 
with the OBA's investigation, he has complied with the terms of the deferment 
order, his conduct was not related to his practice of law, and he has made full 
restitution. The witnesses that testified in his behalf, including his 
counselor, think he is fit to practice law and would not have anticipated 
Respondent's behavior on October 26, 2011.[11]
III. VIOLATIONS OF THE ORPC AND THE RGDP
¶17 The OBA alleges and the Respondent admits that he violated Rule 8.4(b) of 
the ORPC and Rule 1.3 of the RGDP. A lawyer's violent acts in the form of 
domestic abuse demonstrate a lawyer's unfitness to practice law. See Rule 
8.4, cmt. 2, ORPC. The facts underlying the conviction are the facts in the 
disciplinary proceeding. Rule 7.2, RGDP. Respondent's acts show a disregard for 
the laws that he has sworn to uphold and for the rules governing lawyers' 
conduct. The characterization of Respondent's conduct as criminal, civil, or 
neither matters not. State ex rel. Okla. Bar Ass'n v. Livshee, 1994 OK 12, ¶ 8, 870 P.2d 770, 774. "The misconduct 
clearly does not comport with accepted professional standards because it is 
likely to undermine public confidence in and perception of the legal profession 
as a community of law-abiding practitioners." Id. 
¶18 The evidence shows that Respondent violated Rule 1.8(j) of the ORPC, as 
well as Rule 8.4(b) of the ORPC and Rule 1.3 of the RGDP. Rule 1.8(j) prohibits 
a lawyer from beginning a sexual relationship with a client. Even though 
Respondent withdrew his representation of J.D. in her divorce proceeding shortly 
after beginning a sexual relationship with her, he nonetheless violated Rule 
1.8(j). However, the OBA did not allege facts in the complaint in support of a 
violation of Rule 1.8(j). Due process considerations limit this Court's exercise 
of power to discipline Respondent for a violation of Rule 1.8(j). If this were 
the only rule the Respondent had violated, we would be compelled to dismiss the 
complaint. But it is not. And while we cannot consider Respondent's violation of 
Rule 1.8(j) in determining whether Respondent violated the ORPC, we may consider 
this violation, as we consider other factors presented by the evidence, in 
determining the appropriate discipline.
IV. DISCIPLINE
¶19 The evidence does not support the parties' stipulations to the mitigation 
that Respondent's misconduct did not relate to his practice of law and that he 
has made full restitution. First, Respondent was in a position of trust when he 
started the sexual relationship with J.D. that led to his acts of domestic 
violence. Certainly taking advantage of a client going through a divorce and 
heaping violence upon that now former client relates to his practice of law. 
Second, there is no evidence that Respondent paid for J.D.'s medical and 
counseling expenses resulting from the physical and psychological injuries as a 
result of the domestic violence inflicted upon her. Further, Respondent can do 
nothing to rectify the psychological damage he inflicted on J.D. Respondent's 
testimony regarding the events of October 26, 2011, to portray J.D. as the needy 
party in the relationship and himself in a more favorable light, shows that 
Respondent has not accepted responsibility for his actions and undermines the 
testimony of his remorse.
¶20 Next we turn to the issue of the manner in which this bar matter came to 
this Court. But for the district court clerk's failure to comply with Rule 7.2 
of the RGDP by filing the order deferring sentencing and judgment with the Chief 
Justice,[12] 
this disciplinary process would have been initiated within a short time after 
his plea (instead of six months later), and the Respondent would have been 
suspended from the practice of law soon thereafter. Rule 7.3, RGDP. Rule 7.2 
allows, but does not require, the OBA to forward this documentation to the Chief 
Justice when it receives it, and, in this case, the OBA did not do so. Rather, 
the OBA filed this disciplinary proceeding under Rule 6 of the RGDP. The OBA was 
previously warned about taking advantage of a court clerk's failure to comply 
with Rule 7.2 in State ex rel. Casey, 2012 OK 93, 295 P.3d 1096 (Kauger, J. 
concurring in part/dissenting in part); State ex rel. Okla. Bar Ass'n v. 
Conrady, 2012 OK 29, 275 P.3d 133 (Kauger, J. concurring 
specially).
¶21 Because neither the district clerk nor the OBA filed the order deferring 
the judgment and sentence in the criminal case with the Chief Justice pursuant 
to Rule 7.2 of the RGDP, we cannot follow the Rule 7 procedures. However, our 
discipline would be uneven if this Court ignores Rule 7 and allows a lawyer to 
escape suspension merely because a district court clerk failed to follow Rule 
7.2. Further, it would be inconsistent for this Court to impose discipline of a 
suspension under Rule 7 for criminal acts showing an unfitness to practice law 
but not do so when the proceeding is filed under Rule 6. This Court will not 
allow the OBA to circumvent Rule 7's mandates by bringing this proceeding under 
Rule 6 rather than filing the documents from the criminal proceeding with the 
Chief Justice. Under Rule 7.3, an immediate interim suspension is mandated as 
part of the discipline to protect the public and the integrity of the judicial 
system and the reputation of the bar.
¶22 In this regard and because the OBA's failed to take heed after the 
warnings in Casey and in Conrady, it has become necessary to take 
more assertive measures in addressing the problem of the OBA electing to file 
what should be a Rule 7 proceeding under Rule 6. In order to remedy this 
problem, the OBA is directed, in all future cases, to furnish certified copies 
of documents listed in Rule 7.2 to the Chief Justice within five days of 
receiving such documents.
¶23 In support of their request for public reprimand, the OBA and Respondent 
cite to State ex rel. Okla. Bar Ass'n v. Corrales, 2012 OK 64, 280 P.3d 968 (pled to three counts 
of assault and battery; did not involve a client or former client); State ex 
rel. Okla. Bar Ass'n v. Murdock, 2010 OK 32, 236 P.3d 107 (entered Alford plea 
to the misdemeanor charge of Outraging Public Decency, in violation of 21 O.S.2001 § 22; did not involve a 
client or former client); State ex rel. Okla. Bar Ass'n v. Garrett, 2005 OK 91, 127 P.3d 600 (pled guilty to 
misdemeanor battery; no client or former client involved); State ex rel. 
Okla. Bar Ass'n v. Foster, 2000 
OK 4, 995 P.2d 1138 
(feloniously touching a minor with intent to commit felony of procuring obscene 
and indecent photographs); State ex rel. Okla. Bar Ass'n v. Sopher, 1993 OK 55, 852 P.2d 707 (unwelcome sexual 
advances toward client and client's mother). One of the purposes of discipline 
is to deter like misconduct in the practicing bar. State ex rel. Okla. Bar 
Ass'n v. Golden, 2008 OK 39, 
¶ 11, 201 P.3d 862, 864. It is 
obvious from Respondent's misconduct that the cases relied on by Respondent in 
his quest for public censure did not serve to deter Respondent.
¶24 As incidents of domestic and intimate partner abuse rise and become the 
focus of legislation, see 21 
O.S.2011, § 644(C), and public attention,[13] it becomes more incumbent on this 
Court to protect the public by sending a message to other lawyers that this 
misconduct is considered a serious breach of a lawyer's ethical duty and will 
not be tolerated. The trial judge thought it necessary to keep Respondent in the 
criminal system for a full two years for the safety of the public. Consistent 
with the trial judge's logic, anything less than a two-year suspension from the 
practice of law does not protect the public, nor would anything less than a 
two-year suspension protect the integrity of the judicial system and the 
reputation of the bar.
V. CONCLUSION
¶25 Respondent violated Rule 8.4(b) of the ORPC and Rule 1.3 of the RGDP, and 
his actions show a lack of fitness to practice law and have brought disrepute to 
the judicial system and the legal profession. Respondent stands suspended from 
the practice of law for two years; however, if Respondent's judgment and 
sentencing is accelerated, this Court may reconsider the discipline imposed 
today. The OBA is directed to immediately notify this Court of any motion to or 
order accelerating the judgment and sentence.
¶26 The OBA filed an application for costs pursuant to Rule 6.16 of the RGDP 
in the amount of $718.68. Because this proceeding was not brought under the 
proper rule, the motion for costs is denied.

RESPONDENT SUSPENDED; MOTION TO ASSESS COSTS DENIED.

Concur: Reif, V.C.J., and Kauger, Taylor, Combs, and Gurich, JJ.
Concur in Part, Dissent in Part: Colbert, C.J., and Watt, J.
Dissent: Winchester and Edmondson, JJ.
 

FOOTNOTES

[1] Rule 
8.4 of the ORPC provides:
It is professional misconduct for a lawyer to:
(b) commit a criminal act that reflects adversely on the lawyer's honesty, 
trustworthiness or fitness as a lawyer in other respects;
Comment 2 to Rule 8.4 ORPC provides:
Although a lawyer is personally answerable to the entire criminal law, a 
lawyer should be professionally answerable only for offenses that indicate lack 
of those characteristics relevant to law practice. Offenses involving violence, 
dishonesty, breach of trust, or serious interference with the administration of 
justice are in that category. A pattern of repeated offenses, even ones of minor 
significance when considered separately, can indicate indifference to legal 
obligation.

[2] Rule 
1.3 of the RGDP provides:
The commission by any lawyer of any act contrary to prescribed standards of 
conduct, whether in the course of his professional capacity, or otherwise, which 
act would reasonably be found to bring discredit upon the legal profession, 
shall be grounds for disciplinary action. . . .

[3] The 
text messages are found in Appendix A to this opinion.

[4] There 
are no allegations or evidence of rape either in the criminal assault and 
battery case or in this bar proceeding.

[5] See 
21 O.S.2011, § 644(C). 
Section 644(C) provides in relevant part:
Any person who commits any assault and battery against . . . a person with 
whom the defendant is in a dating relationship as defined by Section 60.1 of 
Title 22 of the Oklahoma Statutes . . . shall be guilty of domestic abuse. Upon 
conviction, the defendant shall be punished by imprisonment in the county jail 
not exceeding one (1) year, or by a fine of not more than Three Thousand Dollars 
($3,000.00), or by both such fine and imprisonment. . . .

[6] See 
21 O.S.2011, § 1760, which 
provides:
A. Every person who maliciously injures, defaces or destroys any real or 
personal property not his or her own, in cases other than such as are specified 
in Section 1761 et seq. of this title, is guilty of:
1. A misdemeanor, if the damage, defacement or destruction causes a loss 
which has an aggregate value of less than One Thousand Dollars ($1,000.00);
. . .
B. In addition to any other punishment prescribed by law for violations of 
subsection A of this section, he or she is liable in treble damages for the 
injury done, to be recovered in a civil action by the owner of such property or 
public officer having charge thereof.
J.D. also filed a civil suit against Respondent which was settled. The 
details are not part of the record before this Court.

[7] Our 
focus on the criminal proceedings is not meant to undermine the seriousness of 
the protective order. However, the criminal proceedings and the protective order 
are based on the same set of facts.

[8] J.D.'s 
post-event symptoms are consistent with The National Intimate Partner and Sexual 
Violence Survey which made the following findings:
. Eighty-one percent of women who experienced rape, stalking, or physical 
violence by an intimate partner reported significant short- or long-term 
impacts, such as post traumatic stress disorder symptoms and injury. Thirty-five 
percent of men report such impacts of their experiences.
. . .
. Men and women who experienced these forms of violence were more likely to 
report frequent headaches, chronic pain, difficulty with sleeping, activity 
limitations, poor physical health, and poor mental health than men and women who 
did not experience these forms of violence.
Centers for Disease Control and Prevention, National Intimate Partner and 
Sexual Violence Survey 2010 Summary Report (2010) available at 
http://www.cdc.gov/violenceprevention/pdf/cdc_nisvs_overview_insert_final-a.pdf.

[9] The two 
years in the deferment order coincide with the time for the continuation of the 
protective order.

[10] In 
opening statements, Respondent's attorney gives a different story. He contends 
J.D. and Respondent struggled over a wine bottle, Respondent let go, and the 
wine bottle hit J.D. across the nose, resulting in the police being called. 
There is no evidence in the record that a struggle over a wine bottle caused 
J.D.'s injuries, and it is belied by the evidence and the facts underlying 
Respondent's plea to the criminal charges.

[11] 
Rarely, if ever, has there been a character witness in a bar proceeding who was 
not surprised by a respondent's misconduct and that did not vouch for a 
respondent's fitness to practice law, see State ex rel. Okla. Bar Ass'n v. 
Shofner, 2002 OK 84, ¶ 9, 60 P.3d 1024, 1028, lessening the 
value of character testimony. This is especially true when, like here, two of 
the character witnesses were chairs of the Tulsa County Grievance Committee, 
which this Court chastised for conducting its own grievance process, State ex 
rel. Okla. Bar Ass'n v. Downes, 2005 OK 33, ¶¶ 24-27, 121 P.3d 1058, 1064-65, and had to 
be admonished again before discontinuing the process. State ex rel. Okla. Bar 
Ass'n v. Whitebook, 2010 OK 
72, ¶¶ 1-8, 242 P.3d 517, 
524-26 (Kauger, J. concurring in part and dissenting in part).

[12] 
Rule 7.2 requires a district court clerk, when a lawyer is the subject of a 
conviction or deferred sentence, to forward "certified copies of the Judgment 
and Sentence on a plea of guilty, order deferring judgment and sentence, 
indictment or information and judgment and sentence of conviction to the Chief 
Justice of the Supreme Court and to the General Counsel of the Oklahoma Bar 
Association within five (5) days after said conviction. . . ."

[13] In 
2011, there were 114 deaths in Oklahoma as a result of domestic violence. 
Oklahoma Domestic Violence Fatality Review Board, 2012 Annual Report 2 (2012), 
http://www.oag.state.ok.us/oagweb.nsf/0/58705086998c136086257ae70065cd21/$FILE/2012%20DVFRB%20Annual%20Report.pdf. 
"Fifty-two percent of the intimate partner homicide victims were attempting to 
leave or had left the perpetrator at the time of their death." Id. at 
7.
 
 
Appendix A
The text messages follow.
Date unknown:
Respondent: "Want to spend the rest of my life w ypu"
Respondent: "They do it's not me. They both said it"
Respondent: "They can tell that I love you"
J.D.: "Clean up. See you weds"
Respondent: "Clea n up?"

 
 The messages from October 24, 2011, follow.
Respondent: "Good morning I love you."
J.D.: "Way too early."
Respondent: "Agreed."
Respondent: "Call me when you get to Miami. When do you get back on Wed,? And 
let's go out Wed, night"
J.D.: "Not sure on Weds. Haven't booked my ticket. Will depend on 
availability. Sadly right now I don't want anything but sleep. California has me 
all messed up."
Respondent: "I understand. But plan on it."
J.D.: "Depends on when I get back. I have to go to OKC on Thursday 
morning."
Respondent: "Nor taking no. So just plan on it."
. . .
Respondent: "Ok was it a good day?"
Respondent: "I love you."
J.D.: "Yes it was a good day. How was yours?"
. . .
Respondent: "Ok this may seem silly, but I changed your contact info. It had 
been under [D.] for a year. It's now [J.]. It's about time."
Respondent: "I love you [J.D.]."

 
 The messages from October 25, 2011, follow.
Respondent: "Good morning. I love you."
Respondent: "Hello"
J.D.: "Hey. Getting dressed. Meeting Greg for breakfast"
Respondent: "Ok I'm sort of having anxiety. Dint know who Greg is but I need 
to know you love me. O"
J.D.: "Greg is my work associate. I do love you."
Respondent: "Thank you I really needed that. I miss you so much it 
hurts."
Respondent: "Just thinking of you."
Respondent: "Hello [J.D.]."
J.D.: "Hey."
Respondent: "You busy or can I call?"
J.D.: "Sorry on a cc"
. . .
Respondent: "I love you [J.D.]."
Respondent: "I understand thank to for calling I'll call you later."
Respondent: "Do you know I love you?"
J.D.: "Just got to dinner. Hour walk on the beach. Amazing"
Respondent: "Super so do you know?"
J.D.: "Nope"
Respondent: "I love you very very much"
J.D.: "We will see"
Respondent: "I know. I understand you ate wary. Please believe me you are all 
I think about. I know I need to prove it more. I will. Do you love me 
[J.D.]?"
Respondent: "Please respond"
Respondent: "Did I do something."
Respondent: "I love you."
J.D.: "On my way to hotel"
Respondent: "Ok can I call in a bit?"
Respondent: "Called please"
J.D.: "?? Just got to hotel"
Respondent: "Sorry meant call me please"
J.D.: "??"
Respondent: "Please answer I want to talk some more I'm sorry I live you"
J.D.: "I'm sorry I love you too?"
Respondent: "Please answer"
J.D.: "I don't want to talk to you anymore"
Respondent: "Please just for a minute"
J.D.: "Why?"
Respondent: "I don't want to ent the conversation like that"
Respondent: "Please [J.D.]"
J.D.: "How do you want to end it?"
Respondent: "I liove you"
Respondent: "Better"
Respondent: "I want it to end that we end up together because we love and 
respect each other. I dint want us to end"
Respondent: "Please let me hear you voice"
Respondent: "Please give me five minutes"
J.D.: "1 minute"
Respondent: "Ok"
Respondent: "I'm sorry. I don't want anyone but you."
J.D.: "Keep this up you can have anyone but me
You have no idea how much I 
challenge myself about you
When you push you over me. Not a win win"
Respondent: "I don't understand"
J.D.: "?"
Respondent: "The last sentence"
J.D.: "Why?"
Respondent: "I didn't understand it"
J.D.: "It's all about you"
Respondent "I asked what I can do for you, as far as I'm concerned it's all 
about you and how I fix my mistakes."
Respondent: "Can I ask you a question?"
J.D.: "going to bed. Do not want to talk to you"
Respondent: "Ok may I text you a question?"
J.D.: "Like you ask?"
Respondent: "May I please?"
J.D.: "That was your question. yep. Done"
Respondent: "No I mean may I ask you a question?"
J.D.: "That's question 3"
Respondent: "Well you never said I could ask so not sure but do I have a 
chance or do you hate me top much? I love you but I don't want to hurt you. I 
know I've said it before, I'm trying I rally am."
Respondent: "Yours tired get some rest and well talk tomorrow can't wait to 
see you. Mark"
Respondent: "Just wanted to say good nite. I love you."
Respondent: "You asleep?"

 
 The messages from October 26, 2011, follow.
At 5:43 am
Respondent: "Good morning [J.D.]. I love you can't wait to see you 
tonite."
At 7:20 am
Respondent: "Hello?"
J.D.: "Hey. At breakfast. Heading to the office."
Respondent: "Can I call in a bit?"
At 7:31 am
Respondent: "Do you love me?
Respondent: "Hey"
J.D.: "I'll be free this afternoon"
At 7:47 am
Respondent: "Do you live me? Can I see you tonite?"
Respondent: "Please tell me you love me."
J.D.: "I love you"
Respondent: "Thank you. I hope so. I really am trying. I love you 
[J.D.]."
J.D.: "I know you are trying."
At 8:01 am
Respondent: "You didn't say that you loved me to get me to calm down, you 
really do live me?
Respondent: "Sorry love me"
Respondent: "I love you and I'll keep trying."
At 8:45 am
Respondent: "Just thinking of you."
At 9:42 am
Respondent: "Damn I miss you"
At 10:42 am
Respondent: "I'm in depo this aft."
At 11:58
Respondent: "May I see you tonite?"
J.D.: "Yes. If I get back ontime. 830. I leave for OKC tomorrow morning."
Discussion about dinner menu.
J.D.: ". . . Also I have a really tight connection in Dallas. If I miss it 
next one gets in at 10"
Respondent: "I can't wait until 10; what do want for dinner then?"
At 12:17 pm
J.D.: "It will be too late for me to eat."
Respondent: "Ok I love you [J.D.]."
At 1:53 pm
Respondent: "Just thinking of you"
Respondent: "Getting cooler here."
At 6:57 pm
Respondent: Did you land in DFW yet?"
J.D.: "Just got here. Flight in 40 min. . . ."
More discussion about dinner menu and children
Respondent: ". . . [E.] thinks you should marry me"
Respondent: "I agree w her"
Respondent: "I love you [J.D.]"





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1992 OK 164, 848 P.2d 543, State, ex rel. Oklahoma Bar Ass'n v. Donnelly
Discussed 1993 OK 55, 852 P.2d 707, 64 OBJ 1345, State ex rel. Oklahoma Bar Ass'n v. Sopher
Discussed 1994 OK 12, 870 P.2d 770, State ex rel. Oklahoma Bar Assn. v. Livshee
Discussed 2002 OK 84, 60 P.3d 1024, STATE ex. rel. OKLAHOMA BAR ASS'N v. SHOFNER
Discussed 2005 OK 16, 114 P.3d 414, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CHAPMAN
Discussed 2005 OK 33, 121 P.3d 1058, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. DOWNES
Discussed 2005 OK 91, 127 P.3d 600, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GARRETT
Discussed 2008 OK 39, 201 P.3d 862, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GOLDEN
Discussed 2010 OK 32, 236 P.3d 107, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MURDOCK
Discussed 2010 OK 72, 242 P.3d 517, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WHITEBOOK
Discussed 2012 OK 29, 275 P.3d 133, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CONRADY
Discussed 2012 OK 64, 280 P.3d 968, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CORRALES
Discussed 2012 OK 93, 295 P.3d 1096, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CASEY
Discussed 2000 OK 4, 995 P.2d 1138, 71 OBJ 128, State ex. rel. Oklahoma Bar Ass'n v. Foster
Discussed
Title 21. Crimes and Punishments Cite
Name
Level 21 O.S. 22, Acts Resulting in Gross Injury - Misdemeanor
Cited 21 O.S. 644, Punishment for Assault and Battery
Discussed 21 O.S. 1760, Maliciously Defacing Property of Another - Penalty - Civil Action
Cited