STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LEVISAY



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LEVISAY

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LEVISAY
2020 OK 86
Case Number: SCBD-6827
Decided: 10/06/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 86, __ P.3d __

 




State of Oklahoma ex rel. Oklahoma Bar Association, Complainant,
v.
Shelley Lynne Levisay, Respondent.

PROCEEDING FOR BAR DISCIPLINE

¶0 This is a summary disciplinary proceeding initiated pursuant to Rule 7.1 and 7.2 of the Rules Governing Disciplinary Proceedings ("RGDP"), 5 O.S.2011, ch. 1, app. 1-A, after Respondent Shelley Levisay pled no contest to a felony count of Harboring a Fugitive from Justice in violation of 21 O.S.2011, § 440. Respondent received a two-year suspended sentence, community service, and a fine. On September 20, 2019, the Oklahoma Bar Association ("OBA") transmitted a certified copy of the record relating to the conviction, and on October 7, 2019, this Court ordered Respondent's interim suspension. Following a mitigation hearing before the Professional Responsibility Tribunal ("PRT"), the OBA and Respondent submitted an agreed Joint Proposed Findings of Fact and Conclusions of Law. The PRT adopted these findings and concluded that Respondent had proven mitigating factors of domestic abuse victimization, had no prior discipline, and candidly accepted responsibility for the events that gave rise to her conviction. The PRT recommended a two-year suspension "at maximum" effective from the date of her interim suspension. Upon de novo review, we find a suspension of one year serves the important goals of discipline.

RESPONDENT IS SUSPENDED FOR ONE YEAR EFFECTIVE FROM
THE DATE OF INTERIM SUSPENSION, OCTOBER 7, 2019, AND
ORDERED TO PAY COSTS.

Attorneys and Law Firms:
Loraine Dillinder Farabow, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.
Carlos M. Henry, Henry Law Firm, Oklahoma City, Oklahoma, for Respondent.


DARBY, V.C.J.:
I. FACTUAL BACKGROUND
¶1 Respondent, Shelley Lynne Levisay, was admitted to the practice of law in Oklahoma in 2011. She has had no prior discipline. The PRT describes this summary disciplinary matter as "a very unfortunate picture of an attorney who found herself embroiled in a relationship which ultimately made her the victim of domestic abuse." PRT Report, 1. The PRT recounts how the testimony of Respondent and character witnesses depicted "a sound individual and very capable attorney who became romantically involved with a former client." Id. This former client, Adrian David Ray Gerdon, physically and mentally abused Respondent throughout their relationship, including strangulation, death threats, punching, hitting, and whipping with a belt. Id. at Ex. A, ¶ 14; Hr'g Tr., 225-37.
¶2 In September 2016, after a fight in which Gerdon felt Respondent was "being disrespectful," he beat her multiple times with a belt, asking: "Did you learn your lesson about having an attitude?" Hr'g Tr., 237. Respondent went to bed in severe pain, and a few hours later Gerdon woke her in the middle of the night standing over her body, throwing water on her with a lighter in his hand. Id. at 237-38; see also PRT Report, Ex. A, ¶ 18. He told her he was covering her in gasoline and was going to set her on fire. Gerdon often joked about how funny this incident was and how he would like to do it again. Hr'g Ex. 20, JEX 625; Hr'g Tr., 238-39. Record text messages confirm one instance in which Respondent tried to leave Gerdon and he responded: "You are F***ing psychotic! You aren't going anywhere! Stay your ass there[;] we are about to have a come to Jesus moment! I am seriously pisse[d] the f*** off!" Hr'g Ex. 18, JEX 602.
¶3 Throughout their relationship, Respondent met Gerdon's every financial and personal need at great personal cost. Hr'g Tr., 98-111. Respondent hired and paid for attorneys to represent Gerdon in at least five (5) separate criminal cases, including cases in which she was the victim. PRT Report, Ex. A, ¶¶ 20-21. Respondent spent over $7,500 in attorney fees and over $30,000 in bond premiums on Gerdon's behalf. Id. at ¶ 21; Hr'g Tr., 252. In total, Respondent incurred between $50,000 and $75,000 in debt because of Gerdon.[1] Id. On several occasions, Gerdon threatened to try to get Respondent's law license taken away if she left or did not comply with his demands. Hr'g Ex. 18, JEX 608. In one such instance, Gerdon told her in a text message: "Going to make your life a living hell now. . . . Hope you enjoy being an attorney[.] You want to f*** with me!!!! It's [o]n I guarantee it!!!!" Id. at 22, JEX 636. At the mitigation hearing, Respondent's former co-worker testified that he witnessed Gerdon's intimidation and emotional abuse of Respondent and, based on his experience as a domestic violence lawyer and as a prosecutor, he believed Gerdon would kill Respondent. Hr'g Tr., 29, 40.
¶4 Following a vicious assault by Gerdon with a knife in January 2016, Respondent obtained a protective order against him.[2] The State brought criminal charges, and on June 21, 2016, Gerdon pled guilty to domestic abuse assault and battery, assault with a dangerous weapon, larceny from a house, and unauthorized use of a vehicle.[3] On the same date, Gerdon also pled guilty and received convictions in seven separately styled cases involving Respondent and other victims.[4] Pursuant to plea negotiations, the district court ordered all cases and counts to run concurrently for a combined twelve-year sentence, all suspended, with stated conditions including in-patient treatment through the VA Hospital Psychiatric Unit.
¶5 Gerdon later violated the terms and conditions of his probation, and the State moved to revoke his suspended sentences on November 2, 2017. Gerdon failed to appear at the revocation hearing on December 27, 2017, because he had checked into the VA facility the night before, reporting suicidal thoughts. Respondent was present in the courtroom when Gerdon's cases were called, and she informed the court honestly of Gerdon's location. The district court reset the hearing for January 31, 2018, but also issued arrest warrants, advising the warrants were not to be recalled despite the setting of a later hearing date.
¶6 Respondent then secured Gerdon's bail bondsman, who stated in a sworn affidavit that Respondent contacted her immediately after the hearing, advised of Gerdon's commitment at the VA, and offered to provide the address of this location if needed. Hr'g Ex. 3, JEX 44. The bondsman and her bonding agents agreed they did not need to pick up Gerdon, even after discharge from the VA facility, "since he had a court date to turn himself in." Id. The bondsman advised the Pottawatomie County Court Clerk's Office that she would "wait for [Gerdon] to turn himself in at his court date because [the bondsman] did not believe he was a flight risk." Id. Respondent told the bondsman if for whatever reason Gerdon failed to show up on the 31st, she would take the bondsman to him. Hr'g Tr., 264-65. Indeed, as cosigner on the bond, Respondent would be responsible for the full amount if Gerdon fled. After Gerdon left the VA facility on December 29, 2017, he returned to his personal residence where he had been living since October 2017. Hr'g Ex. 2, JEX 37.
¶7 With full knowledge that the district court had not withdrawn the warrants, Respondent continued to provide Gerdon with the same financial, emotional, and physical support she had provided throughout their relationship. She repeatedly brought him whatever food, cash, and supplies he requested, and he continued to use the vehicle she had previously bought him. Based on Gerdon's continued threats, Respondent testified that she believed: "[I]f I don't do what he wants, he's going to hurt me or he's going to ruin my career." Hr'g Tr., 330. On January 24, 2018, Gerdon was arrested on his outstanding warrants and taken into custody.
¶8 Soon after, on February 7, 2018, the Cleveland County District Attorney's Office charged Respondent with one felony count of Harboring a Fugitive From Justice, in violation of 21 O.S.2011, § 440.[5] On September 11, 2019, Respondent entered a blind plea of no contest, and the district court sentenced Respondent to two years, all suspended, 100 hours of community service, and a $5,000 fine. On September 20, 2019, the OBA transmitted a certified copy of the record relating to the conviction, and pursuant to Rule 7.3 of the RGDP, the Court entered an order of immediate interim suspension on October 7, 2019. The order directed Respondent to show cause, if any, no later than October 21, 2019, why the interim suspension should be set aside. Respondent did not contest the interim suspension, but requested a mitigation hearing before the PRT. On November 18, 2019, the Court granted the Rule 7 hearing on the limited scope of mitigation and recommendation of discipline. At the hearing on January 15, 2020, Respondent presented sworn testimony from five character witnesses, including herself. The OBA did not present witnesses or refute the testimony of Respondent's witnesses. The PRT filed its report on February 14, 2020, adopting and attaching with it the parties' agreed Joint Proposed Findings of Fact and Conclusions of Law. On June 2, 2020, the Court received the completed record sufficient for review.[6]
¶9 Both the PRT and OBA note the "unique circumstances of this case" and compelling mitigation evidence. PRT Report, 6, Ex. A, ¶ 46. The PRT and OBA conclude that based on the evidence presented, Respondent supported Gerdon as she had before, "under threat of violence." Id. at 2 (emphasis added). As the PRT states, "[b]ecause Gerdon was then a fleeing felon, Respondent's continued support of him caused her to be charged with harboring a fugitive." Id. Strikingly, this is despite the reset court date and the bondsman's assurances that Gerdon did not pose a flight risk. The record reflects that throughout the twenty-six days of providing Gerdon the food and items he requested, Respondent repeatedly encouraged him to check-in with his probation officer and/or return to treatment at the VA hospital. Hr'g Ex. 4, JEX 45-46, 52, 57, 142-45, 166-67. Respondent testified that she had every belief Gerdon would appear for the revocation hearing as scheduled. Respondent never encouraged Gerdon to flee the jurisdiction or change locations as a result of the outstanding warrants. Id. at 2, JEX 37. Gerdon was still living in his trailer home in the same location he had been living since October 2017, before the State moved to revoke his probation. Id. Law enforcement officers never questioned Respondent about Gerdon's whereabouts in effort to execute the warrants, but she never took it upon herself to alert them after alerting the bondsman of his location. Id.
¶10 Balanced against Respondent's efforts to encourage Gerdon to appear is her knowledge of Gerdon's overall propensity for violence. Text messages show Respondent asking Gerdon if he was involved in an officer-related shooting she heard about in the news during this period. Respondent admitted that she knew Gerdon was dangerous and she "could have seen him attacking an officer and an officer having to shoot him." Hr'g Tr., 268. Additionally, during this time Gerdon physically assaulted one of his former girlfriends, chasing her around the trailer property with a gun. Respondent did not learn of this incident until much later, but she agreed on cross-examination that the harm could have potentially been avoided had she reported Gerdon after he left the VA facility. Hr'g Ex. 4, JEX 229-32. Respondent admits that even with the very real fear for her safety if she reported him, it was not an impossibility and that she had successfully done so following Gerdon's violence against her in the past. Alongside this acknowledgment, Respondent avers that she "did the best [she] could to use whatever influence [she] had to get Gerdon to court and the help he so desperately needs." Id. at 2, JEX 38.[7]
¶11 In her response letter to the OBA, Respondent stated, in part, the following:
I can see that what I did violated the clear black letter of the harboring statute. Never did I imagine I was harboring Gerdon. I was doing as I had been doing for the past two years supporting him and trying to get him the therapeutic help he needed. Knowing leaving him would be difficult, if not dangerous for me, I chose to help his [sic] understanding that soon, very soon, he would be going to prison and I would be forced to separate from him and seek help to solve the issues that drew me to him. Never did I interfere with the administration of justice, or at least so I thought. All my actions were aimed at getting him to court, and getting him the help he needed to live life productively.
Id. At her criminal sentencing hearing, Respondent testified:
"[O]ne of the things that I've really learned through counseling and getting away from this codependent relationship was my whole world was engrossed and encircled by this guy, including my relationship with God. Everything was secondary to this guy. And I just realize how dysfunctional it was. . . . I was just blind.
Id. at 4, JEX 213.
¶12 The extensive record of Respondent's educational and professional achievements, civic and religious involvement, and upstanding reputation in the community all draw a sharp contrast to the decisions she made after becoming entrenched in this abusive relationship. Respondent was valedictorian of her high school class. She graduated magna cum laude from the honors college at Oklahoma Baptist University with a double major in political science and music performance. She then attended law school at The University of Oklahoma College of Law where she earned numerous awards for oral advocacy as well as three "American Jurisprudence" honors for the highest grade in her class. Respondent is a past president of the Shawnee Bar Association, officer in the Shawnee Rotary Club, officer in the philanthropic nonprofit "Soldiers for Christ," board member for Youth and Family Services, auxiliary member for Project Safe (domestic violence agency), and member of the Shawnee Area Music Teachers Association.
¶13 Before Gerdon, Respondent had never previously been in a romantic relationship. Until age thirty, she lived with her mother who treated her like a young child, controlling her finances, personal life, and social life.[8] Hr'g Tr., 198, 201, 205-07, 212-14; PRT Report, Ex. A, ¶¶ 10-12. Respondent described that since her parents' divorce at age ten and her father's abusive, inappropriate behavior toward her, she knew she wanted to become a lawyer to advocate for women and children. Hr'g Tr., 189-90; PRT Report, Ex. A, ¶ 40. Pursuing this goal in law school, Respondent began interning in the District Attorney's Office in Pottawatomie and Lincoln Counties, and by her third year she was hired as the director for the Unzner Child Advocacy Center. She secured grant funding, regained the Center's accreditation, oversaw forensic interviews, and coordinated multidisciplinary teams of law enforcement, child welfare workers, and prosecutors. Hr'g Tr., 196.
¶14 Upon finishing law school and passing the Bar, the District Attorney hired Respondent as an ADA to prosecute domestic violence cases in the same counties. While working as a prosecutor, Respondent's maternal grandmother, to whom she was very close, was placed on hospice and died within three days. Hr'g Ex. 2, JEX 32. The District Attorney unexpectedly fired Respondent during this time. Respondent's former co-worker at the DA's Office testified to his belief that Respondent's sudden termination was "politically charged" because Respondent had recently announced her intention to run against her boss for District Attorney in the next election. Hr'g Tr., 42-43. Respondent testified that she was devastated by her termination and felt like quitting her life-long passion of practicing law. Id. at 289. It was four months later that she met Gerdon.[9] Id. at 214.
II. MITIGATION
¶15 There are a number of mitigating factors present in the case before us. The PRT and OBA found the following considerations compelling mitigation with respect to Respondent's conviction: 1) Respondent's lack of any prior discipline; 2) her acceptance of responsibility; 3) her family of origin-derived personality issues; 4) her life calamities occurring shortly before her relationship with Gerdon began -- particularly the death of her only grandparent and her termination from the DA's Office; 5) her personal/emotional issues arising from years of domestic violence; 6) the fact that Respondent sought counseling in 2016 prior to her commission of the crime and has continued in therapy; 7) her involvement and commitment to her community; 8) her commitment to serving domestic violence and child abuse victims; and 9) her remorse. PRT Report, Ex. A, ¶ 44.
¶16 The Court has previously recognized domestic violence victimization as an appropriate mitigating factor in disciplinary proceedings. See State ex rel. Okla. Bar Ass'n v. Black, 2018 OK 85, ¶¶ 11-12, 432 P.3d 227, 230; State ex rel. Okla. Bar Ass'n v. Hastings, 2017 OK 43, ¶¶ 28, 30, 395 P.3d 552, 559. The PRT found compelling the testimony of Respondent's certified therapist, former co-worker at the DA's Office, former professor, and pastor in understanding Respondent's behavior with regard to Gerdon. Respondent's therapist testified at length how forgiveness and rationalization of an intimate partner's past behaviors are common responses for victims both before and after reporting abuse. See Hr'g Tr., 100-05, 107-11, 125-28. She testified that, consistent with Respondent's relationship with Gerdon, reporting often escalates future violence and reasonably prompts victims to consider whether they will be in greater pain if their partner is arrested and released from custody. Id. at 128-29. She stated that in the face of extreme difficulties, Respondent has nonetheless ended all contact with Gerdon, taken responsibility for her actions, and been proactive in her treatment and continued healing. Id. at 117-18, 128-29, 134, 153-54.
¶17 Respondent's former co-worker at the DA's Office, now the current District Attorney, testified that Respondent was a competent and ethical attorney in both her capacities as a prosecutor and as a solo practitioner. Id. at 28, 52, 59. He testified that since her conviction, Respondent has further insulated herself with positive community support and that he strongly believed she would never reoffend. Id. at 51-52. Respondent has fully complied with the Court's interim suspension and has notified clients and withdrawn from all her cases in accordance with RGDP, Rule 9.1. PRT Report, Ex. A, ¶ 32.
III. STANDARD OF REVIEW
¶18 This Court possesses original, exclusive, and nondelegable jurisdiction over all attorney disciplinary proceedings in this State. 5 O.S.2011, § 13; RGDP, Rule 1.1. The purpose of the Court's licensing authority is not to punish the offending lawyer but to safeguard the interests of the public, the courts, and the legal profession. State ex rel. Okla. Bar Ass'n v. Friesen, 2016 OK 109, ¶ 8, 384 P.3d 1129, 1133. In a Rule 7 summary disciplinary proceeding, generally the central concern is to inquire into the lawyer's continued fitness to practice and determine what discipline should be imposed. State ex rel. Okla. Bar Ass'n v. Drummond, 2017 OK 24, ¶ 19, 393 P.3d 207, 214; Hastings, 2017 OK 43, ¶ 17, 395 P.3d at 557. The Court considers de novo every aspect of a disciplinary inquiry, and the PRT's findings of fact, conclusions of law, and recommendation of discipline are not binding on this Court. State ex rel. Okla. Bar Ass'n v. Ezell, 2020 OK 55, ¶ 13, 466 P.3d 551, 554; State ex rel. Okla. Bar Ass'n v. Cooley, 2013 OK 42, ¶ 4, 304 P.3d 453, 454.
IV. DISCIPLINE
¶19 "A lawyer who has been convicted or has tendered a plea of guilty or nolo contendere . . . in any jurisdiction of a crime which demonstrates such lawyer's unfitness to practice law . . . shall be subject to discipline." RGDP, Rule 7.1. The record of conviction constitutes "conclusive evidence of the commission of the crime . . . and shall suffice as the basis for discipline." RGDP, Rule 7.2. While "a criminal conviction does not ipso facto establish an attorney's unfitness to practice law," State ex rel. Okla. Bar Ass'n v. Trenary, 2016 OK 8, ¶ 12, 368 P.3d 801, 806, the commission of any act that would reasonably "bring discredit upon the legal profession, shall be grounds for disciplinary action." RGDP, Rule 1.3. Additionally, it is professional misconduct for an attorney to "commit a criminal act which reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Rule 8.4(b), Oklahoma Rules of Professional Conduct ("ORPC"), 5 O.S.2011, ch.1, app. 3-A. The PRT and OBA concluded that Respondent violated ORPC, Rule 8.4(b) and RGDP, Rule 1.3, and that a suspension from the practice of law for two years "at maximum" would serve the interests of the Court's discipline. PRT Report, Ex. A, ¶ 45. In addition, the PRT recommended continued counseling sessions, drug testing, and a contract with Lawyers Helping Lawyers, all under the supervision of the OBA. The PRT characterized Respondent's misconduct in this case as "a one-time, albeit significant, event." PRT Report, 2.
¶20 Implicitly, the Court's order of interim suspension on October 7, 2019, carries a finding of unfitness to practice law for a period of time. See Drummond, 2017 OK 24, ¶ 20, 393 P.3d at 214. Determining the appropriate length of that period of time is the Court's central concern today. After an order of interim suspension, we are obliged "to again weigh the criminal conduct, together with all evidence bearing on the commensurate level of discipline." Id. In doing so, the Court notes the unique circumstances of Respondent's criminal conviction under the harboring statute, 21 O.S. 2011, § 440. Convictions under this statute have typically involved the harboring defendant actively providing shelter to a fugitive on his or her property and/or making false statements to law enforcement about the fugitive's whereabouts. See Shockley v. State, 1986 OK CR 124, ¶ 2, 724 P.2d 256, 257-58 (making false statements to officers regarding fugitive's location when actually inside defendant's home); Spears v. State, 1986 OK CR 155, ¶ 2, 727 P.2d 96, 97 (allowing fugitives to sleep in house); Zempel v. State, 1976 OK CR 232, ¶ 12, 554 P.2d 1209, 1210-11 (making false statements to officers about knowledge and location of fugitive later found hiding in defendant's home); Davis v. State, 1935 OK CR 163, 57 P.2d 634, 637-38, 59 Okla. Cr. 26, 35, 37 (lying to officers in calculated effort to deceive and thwart fugitives' arrest, colluding in fugitives' escape plan, and furnishing shelter in defendant's home); State v. Franks, 1922 OK CR 90, 206 P. 258, 260, 21 Okla. Cr. 213, 219 (sheltering and concealing fugitives in defendant's home).
¶21 In contrast, Respondent's conviction did not involve an act of physical concealment or making a false statement to law enforcement. The lack of these typical characteristics of Respondent's conviction and the history of manipulation she experienced do not excuse her conduct, but they are appropriate factors for this to Court consider in upholding the goals of protecting the public and preserving the integrity of the bar.
¶22 To administer discipline evenhandedly, the Court considers prior disciplinary decisions involving similar misconduct, but "the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances." State ex rel. Okla. Bar Ass'n v. Wilcox, 2014 OK 1, ¶ 48, 318 P.3d 1114, 1128. We note that State ex rel. Okla. Bar Ass'n v. Blasdel, 2014 OK 44, 360 P.3d 498, is the only previous bar discipline case found where the Court has confronted an attorney's conduct with regard to 21 O.S.2011, § 440. There, however, the State dismissed its criminal case, and the attorney later voluntarily resigned from membership in the OBA before the Court imposed any final discipline. Blasdel, 2014 OK 44, ¶ 1, 360 P.3d at 498.[10] Very dissimilar from the Rule 7 summary disciplinary proceeding before the Court today, Blasdel is a procedurally and factually distinct Rule 8 case which offers little assistance in determining appropriate discipline.
¶23 Making its recommendation of discipline, the PRT cites to State ex rel. Okla. Bar Ass'n v. Hastings, 2017 OK 43, 395 P.3d 552; State ex rel. Okla. Bar Ass'n v. Zannotti, 2014 OK 25, 330 P.3d 11; and State ex rel. Okla. Bar Ass'n v. Ijams, 2014 OK 93, 338 P.3d 639. In Hastings, the offending attorney was a victim of years of domestic violence by his former spouse. 2017 OK 43, 395 P.3d at 553-54. The Rule 7 disciplinary proceeding against him arose after he pointed a firearm at his former spouse, threatened to kill her, and subsequently resisted officers on scene. On the day of the incident, Hastings had been on a drinking binge, and his ex-wife gained access to his home. Their children, present in the home at the time, reported that Hastings pointed his gun at her and said: "You are going to die today. Where do you want it, the gut or the head?" Id. ¶ 4, n.8, 395 P.3d at 554, n.8. When police arrived, Hastings refused to come out. A stand-off ensued, and police used tear gas to force Hastings from his home. The incident was publicized in local newspapers and media. Hastings pled no contest to a misdemeanor charge of pointing a firearm and received a two-year deferred sentence.[11] We did not adopt the recommendation of the PRT and OBA for a suspension of two years and a day. Instead, we found that a two-year suspension was appropriate based, in part, on the attorney's lack of prior discipline, remorse for his actions, commitment to substance abuse treatment, the compliant manner in which he handled the disciplinary process, and the fact that his conduct stemmed from years of domestic violence against him. Id. at ¶ 30. Like in Hastings, Respondent's misconduct relates to her own experience of years of domestic abuse; however, unlike Hastings, Respondent was not the aggressor nor did she threaten physical violence against her abusive partner with the use of a firearm. Rather, Respondent's misconduct was continuing to support her abuser under his threats of violence.
¶24 In Zannotti, the offending attorney severely physically assaulted his former client and girlfriend. 2014 OK 25, ¶¶ 5-9, 330 P.3d at 13-14. In that case, however, Zannotti had not experienced a history of domestic violence by this intimate partner, J.D.; he alone was the perpetrator. The dispute began after Zannotti came to the ex-girlfriend's home to discuss resuming a romantic relationship, took her phone, and smashed it on the driveway saying: "You don't need this. You just need to pay attention to me." J.D. attempted to leave, and Zannotti took her keys, dragged her into the house, and pushed her onto the bed. When J.D. started screaming, Respondent lifted her up by her shoulders, threw her into the bedroom wall, and head-butted her in the face, causing a gash across her nose and two black eyes. Respondent then ordered J.D. to undress and lie down on the bed. He then got on top of her and put his hands around her neck tightly several times, asking her if she loved him and would marry him. Zannotti pleaded no contest to misdemeanor domestic abuse assault and battery and malicious injury to property. We found that in the disciplinary process, Zannotti made claims not supported by evidence, did not fully accept responsibility for his actions, and did not show sincere remorse to his victim. We concluded that a two-year suspension from the practice of law served the goals of protecting the public and the integrity of the judicial system. Unlike Zannotti's severe physical violence and lack of remorse, Respondent's misconduct in no way involved her committing violence against her intimate partner, and she full accepts responsibility for her actions. Imposing the same period of discipline as in Hastings and Zannotti for misconduct of a completely different nature would not be evenhanded and would not serve the goals of discipline.
¶25 Lastly, in Ijams, the attorney received a one-year suspended sentence following a domestic dispute with his former spouse. 2014 OK 93, ¶ 3, 338 P.3d at 641. On the day of the incident, Ijams was under the influence of alcohol and ultimately led police on a high-speed chase. After officers deployed road spikes, Ijams exited his vehicle and continued running until a canine police officer apprehended him. Ijams pled guilty to misdemeanor DUI, eluding a police officer, and operating a vehicle in unsafe condition, and no contest to obstructing a police officer (K9). The district court sentenced Ijams on the DUI to one year, all suspended except seven weekends, deferred sentencing on two counts for eighteen months, and assessed a fine in one count. The suspended sentence was to run consecutive to one deferred sentence and concurrent with another. In mitigation, Ijams showed remorse for the seriousness of his actions, sought treatment, and attended AA to maintain his sobriety. We noted no clients were harmed by his conduct. The Court held that the goals of discipline were satisfied by suspending Ijams until the end of his deferment, eighteen months. This discipline was appropriate even as the suspension would conclude before completion of the attorney's criminal sentence, running consecutively.
¶26 In other instances, we have imposed discipline for periods shorter than the length of the lawyer's criminal felony conviction. In State ex rel. Okla. Bar Ass'n v. Dennison, 1994 OK 33, 872 P.2d 403, the attorney pled no contest to a felony charge of making false statements to a financial institution and received a five-year suspended sentence. We suspended Dennison for two years and seven months, finding mitigating evidence showing his upstanding reputation and the fact that he had no prior discipline and had not violated the terms and conditions of his federal sentence. In State ex rel. Okla. Bar Ass'n v. Burns, 2006 OK 75, 145 P.3d 1088, Burns pled guilty to two felony charges of driving a motor vehicle while under the influence of alcohol on two occasions and for transporting an open container during the second arrest. He received a three-year sentence, all suspended, on the first DUI and a five-year deferment on the second felony, to run concurrently. In mitigation, Burns abstained from alcohol for more than a year, expressed remorse, and accepted responsibility for his actions. We noted that his criminal misconduct did not involve or injure any client. We found the goals of discipline were met by suspending the attorney for six months and placing him under supervised probation for two years. In State ex rel. Okla. Bar Ass'n v. Willis, 1993 OK 138, 863 P.2d 1211, the attorney pled guilty to a felony count of obtaining a controlled substance by misrepresentation and was sentenced to three years federal probation. We imposed a suspension of fifteen months effective from the date of interim suspension. The Court considers Respondent's two-year suspended sentence. Based on the facts presented, the Court finds that a suspension from the practice of law for two years is not necessary to meet the goals of discipline.
V. DISCUSSION
¶27 In this case, Respondent's crime was assisting Gerdon while knowing he had outstanding arrest warrants. As a former Assistant District Attorney, a criminal conviction for harboring a fugitive connotes a particularly significant violation of her ethical obligations. Respondent's arrest and conviction were publicized in local media and reflected poorly on the Bar and legal profession as a whole. Additionally, Respondent admits that she understood Gerdon's propensity for violence and recognized the potential that he could injure someone in the weeks leading up to his court date. Even so, the PRT was convinced that Respondent's actions were motivated by self-protection and colored by a consistent history of Gerdon acting on his threats of violence against her. The Court finds significant the voluminous record evidence of Respondent's attempts to get Gerdon to communicate with his probation officer, return to in-patient treatment before his reset hearing, and affirmatively appear for his upcoming court date. Respondent's efforts to ensure Gerdon appeared are corroborated by the fact that she cosigned on his bond and by testimony of the State's investigating officer at her criminal sentencing hearing.[12] In evaluating Respondent's misconduct, we specifically note that Respondent made no attempt to actively lie to law enforcement, assist Gerdon to flee the jurisdiction, or in any way encourage him to not appear at his upcoming revocation hearing. We also do not overlook the bondsman's statements made to Respondent and to the district court that Gerdon did not need to be picked up on the warrants because he did not pose a flight risk and he had a reset court date.
¶28 The compelling mitigation in this record reflects that Respondent acted, and failed to take action, more as a victimized partner than as a lawyer. Her misconduct did not involve or implicate any breach in her duty to competently represent her clients. Respondent has made significant efforts to take responsibility and productively move beyond this chapter in her life. She has terminated all contact with Gerdon, committed to regular therapeutic counseling, and continued to serve within her community. She has complied with the terms and conditions of her suspended sentence as well as this Court's interim suspension. Respondent has had no prior discipline, and evidence presented at the PRT hearing ardently shows she is unlikely to reoffend. Respondent is exceedingly contrite and remorseful. She takes full responsibility that her support of Gerdon was wrong. Her decisions have carried significant emotional, financial, and professional costs, and she is now a convicted felon.
VI. CONCLUSION
¶29 Upon de novo review, the Court finds that a suspension from the practice of law for one year serves the important goals of protecting the public, deterring similar misconduct, and instilling public trust in the legal profession and administration of justice. Respondent's suspension shall be coupled with the conditions that she continue therapeutic counseling sessions and not violate the terms and conditions of her suspended sentence, as ordered in Cleveland County District Court Case No. CF-2018-169. We note that the PRT recommended, without explanation, that Respondent submit to drug testing. The OBA did not make this recommendation. Consistent with Respondent's testimony that she has never taken illegal substances, Respondent has never been charged with or implicated in any drug-related offense nor tested positive on any court-ordered drug test. We find no evidence to support such a condition, and that condition is stricken.
¶30 Respondent is directed to report compliance with these terms and conditions to the General Counsel of the OBA, and the OBA is likewise directed to notify this Court upon information of any violation. We reserve the right to impose further discipline if Respondent, at any point, violates her suspension from the practice of law or her suspended sentence. The OBA's Application to Assess Costs is granted. Respondent is ordered to pay costs in the amount of $4,250.13, within ninety (90) days after the effective date of this opinion. RGDP, Rule 6.16.
RESPONDENT IS SUSPENDED FOR ONE YEAR EFFECTIVE FROM
THE DATE OF INTERIM SUSPENSION, OCTOBER 7, 2019, AND ORDERED TO PAY COSTS.
CONCUR: Gurich, C.J., Darby, V.C.J., Kauger, Winchester (by separate writing), Edmondson, Colbert and Rowe, JJ.
CONCUR IN PART; DISSENT IN PART: Kane, J.
RECUSED: Combs, J.

FOOTNOTES

[1] Respondent secured and paid for Gerdon's attorneys in: Pottawatomie Cnty. Dist. Ct. Case Nos.: CF-2015-820 (domestic assault and battery by strangulation, threatening, and act of violence); CF-2015-925 (burglary in the first degree and aggravated domestic assault and battery); CF-2016-150 (bringing contraband into a penal institution and possession of a controlled dangerous substance); CF-2016-245 (domestic assault and battery by strangulation), and CF-2016-94 (domestic abuse assault and battery, assault with a dangerous weapon, larceny from a house, and unauthorized use of a vehicle).

[2] The district court granted the protective order for the maximum period of five years, extending to 2022, in Pottawatomie Cnty. Dist. Ct. Case No. PO-2016-27. Shortly thereafter, however, Respondent dropped the protective order. At the mitigation hearing, Respondent's former co-worker also testified about the common cycle he witnessed as a prosecutor, of victims paying for their abuser's court costs and often dropping charges or dismissing protective orders. Hr'g Tr., 39-40.

[3] Pottawatomie Cnty. Dist. Ct. Case No. CF-2016-94.

[4] These cases are Pottawatomie Cnty. Dist. Ct. Case Nos.: CF-2015-820, CF-2015-925, CF-2016-150, CF-2016-245, CM-2016-162, CM-2016-163, and CM-2016-164. As referenced, Respondent paid for Gerdon's representation in the majority of these cases.

[5] According to the plain language of 21 O.S.2011, § 440(A), the actus reus element of harboring a fugitive may be established by evidence of other forms of assistance, even without the act of providing physical shelter to the person. The statute provides:
Any person who shall knowingly feed, lodge, clothe, arm, equip in whole or in part, harbor, aid, assist or conceal in any manner any . . . fugitive from justice . . . shall be guilty of a felony punishable by imprisonment . . . for a period not exceeding ten (10) years.
21 O.S.2011, § 440(A) (emphasis added).

[6] The Court notes that the district court set a one-year modification hearing at the conclusion of her criminal sentencing on September 11, 2019. The docket reflects that on September 9, 2020, the district court continued the modification hearing, and as of the date of this opinion that review is scheduled to take place November 18, 2020.

[7] Gerdon is currently incarcerated. After he was arrested on January 24, 2018, he entered stipulations in his revocation cases (Pottawatomie Cnty. Dist. Ct. Case. Nos.: CF-2015-820, CF-2015-925, CF-2016-94, CF-2016-150, and CF-2016-245 and Cleveland Cnty. Dist. Ct. Case No. CF-2018-170). These state cases were thereafter run concurrently with his 210-month federal sentence for being a felon in possession of a firearm in United States v. Gerdon, CR-2018-53-1-M, 2018 WL 2050166 (W. Dist. of Okla. May 2, 2018). PRT Report, Ex. A, ¶ 27.

[8] Respondent was not allowed to drive outside of town unless absolutely necessary for work. When she would get "in trouble" at home, her mother would confiscate her phone. When Respondent finally moved out in 2016, as a practicing attorney, her mother would only allow her to "take what [she] could carry." Hr'g Tr., 205, 207. She emptied Respondent's savings account of $28,000 to repay her for helping with college and law school. Her mother demanded that Respondent pay her an additional $7,500 before she could collect the remainder of her personal belongings.

[9] The PRT notes that Respondent fully complied with her professional and ethical obligations to discontinue her representation of Gerdon before ever entering a romantic relationship with him. PRT Report, 3.

[10] The dismissed criminal allegations were that Blasdel unlawfully employed a woman as a legal assistant while knowing she had an outstanding arrest warrant and actively concealed her from sheriff's deputies attempting to arrest her at his law office. Blasdel, 2014 OK 44, ¶ 1, 360 P.3d at 498.

[11] Initially, Hastings was charged with two separate felony counts: 1) pointing a firearm, and 2) resisting an officer. Hastings entered into a plea agreement in which the State dismissed both felony counts in exchange for his plea of no contest to a misdemeanor charge, a two-year deferred sentence, and other conditions of drug and alcohol treatment. Hastings, 2017 OK 43, ¶ 6, 395 P.3d at 554-55.

[12] Regarding the many communications between Respondent and Gerdon while he had outstanding warrants, the lead investigator for the Violent Crime Task Force of Pottawatomie County provided testimony as follows:
Q: Were any of those more than 1,000 text messages about fleeing the jurisdiction?
A: . . . [N]o, sir.
. . .
Q: There were no text messages about fleeing?
A: Fleeing the country, no, sir.
Q: Okay. And there were a lot of text messages about going to the VA hospital?
A: That is correct, yes, sir.
Q: And there were text messages about calling his probation officer?
A: Yes, sir.
Q: And she texted him over and over again about going to the VA hospital?
A: Yes, sir.
Hr'g Ex. 4, JEX 164-66.




Winchester, J., with whom Kauger, J. and Rowe, J. join, concurring specially:
¶1 I concur, but I am compelled to express the need to exercise discretion under these very unfortunate circumstances in which this attorney finds herself. Those circumstances are primarily the abuse inflicted on Respondent by a former client, Adrian David Ray Gerdon--including assault by knife, strangulation, death threats, punching, hitting, and whipping with a belt. Respondent's attempts to leave this relationship were met with threats to her career and life.
¶2 After a series of events that caused the district court to issue several warrants for Gerdon's arrest, Respondent secured and cooperated with Gerdon's bail bondsman, advising the bondsman of Gerdon's current location. The bondsman agreed to wait for Gerdon to turn himself in at the upcoming hearing, and Respondent agreed to take the bondsman to Gerdon if he did not attend the hearing. Respondent continued to support Gerdon for a period of twenty-six days. Respondent supported Gerdon out of fear for her career and life. Yet despite that danger, Respondent encouraged Gerdon to contact his probation officer, obtain help by returning to treatment, and appear at his revocation hearing as scheduled.
¶3 Respondent found herself in an untenable situation, which led the Cleveland County District Attorney's Office to charge Respondent with Harboring a Fugitive From Justice, a felony, because of her actions in supporting Gerdon. Respondent pled no contest, and the district court imposed on Respondent a suspended two-year sentence, along with 100 hours of community service and a $5,000 fine.[1] Respondent has served one year of this sentence, but the district court retained discretion to review the sentence.
¶4 The district court scheduled a one-year modification hearing for November 18, 2020. Pursuant to 22 O.S. Supp. 2018, § 982a(A)(1),[2] the district court has the authority and discretion to modify Respondent's criminal sentence at this hearing. Because of the compelling circumstances of this case, this Court used its authority and discretion to suspend Respondent from practice for only one year.

FOOTNOTES

[1] I note that Respondent's abuser also received a suspended sentence--albeit it was for 12 years--for convictions in eight separately styled cases involving Respondent and other victims.

[2] Title 22 O.S. Supp. 2018, § 982a(A)(1) states as follows:
A. 1. Any time within sixty (60) months after the initial sentence is imposed or within sixty (60) months after probation has been revoked, the court imposing sentence or revocation of probation may modify such sentence or revocation by directing that another sentence be imposed, if the court is satisfied that the best interests of the public will not be jeopardized; provided, however, the court shall not impose a deferred sentence. Any application for sentence modification that is filed and ruled upon beyond twelve (12) months of the initial sentence being imposed must be approved by the district attorney who shall provide written notice to any victims in the case which is being considered for modification.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1922 OK CR 90, 206 P. 258, 21 Okl.Cr. 213, Oklahoma v Franks
Discussed
 1935 OK CR 163, 57 P.2d 634, 59 Okl.Cr. 26, Davis v State
Discussed
 1986 OK CR 124, 724 P.2d 256, SHOCKLEY v. STATE
Discussed
 1986 OK CR 155, 727 P.2d 96, SPEARS v. STATE
Discussed
 1976 OK CR 232, 554 P.2d 1209, ZEMPEL v. STATE
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1993 OK 138, 863 P.2d 1211, 64 OBJ 3290, State ex rel. Oklahoma Bar Ass'n v. Willis
Discussed
 1994 OK 33, 872 P.2d 403, 65 OBJ 1190, State ex rel. Oklahoma Bar Assn. v. Dennison
Discussed
 2006 OK 75, 145 P.3d 1088, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BURNS
Discussed
 2013 OK 42, 304 P.3d 453, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. COOLEY
Discussed
 2014 OK 1, 318 P.3d 1114, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WILCOX
Discussed
 2014 OK 25, 330 P.3d 11, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ZANNOTTI
Discussed at Length
 2014 OK 44, 360 P.3d 498, STATE ex rel OKLAHOMA BAR ASSOCIATION v. BLASDEL
Discussed at Length
 2014 OK 93, 338 P.3d 639, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. IJAMS
Discussed at Length
 2016 OK 8, 368 P.3d 801, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TRENARY
Discussed
 2016 OK 109, 384 P.3d 1129, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. FRIESEN
Discussed
 2017 OK 24, 393 P.3d 207, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. DRUMMOND
Discussed at Length
 2017 OK 43, 395 P.3d 552, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HASTINGS
Discussed at Length
 2018 OK 85, 432 P.3d 227, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BLACK
Discussed
 2020 OK 55, 466 P.3d 551, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. EZELL
Discussed
Title 5. Attorneys and the State Bar
 Cite
Name
Level

 5 O.S. 13, Power of Supreme Court
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 440, Harboring a Fugitive - Penalty - Aiding a Sex Offender - Penalty
Discussed at Length
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 982a, Modification of Sentence - Time Limitation - Applicability - Report - Notice and Hearing - Appeal
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA